# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**Mark Lynn J.,**
**Petitioner Below, Petitioner**

**FILED**

**February 21, 2017**

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs)  No. 15-1034** (Mercer County 13-C-431-DS)

**David Ballard, Warden,**
**Mount Olive Correctional Complex,**
**Respondent Below, Respondent**


## MEMORANDUM DECISION

Petitioner Mark Lynn J., by counsel Paul R. Cassell, appeals the Circuit Court of Mercer County's September 23, 2015, order denying his petition for post-conviction habeas corpus relief.[1] Respondent David Ballard, Warden, by counsel Nic Dalton, filed a response in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in denying his habeas petition because (1) his trial counsel was constitutionally ineffective; (2) his sentence was disproportionate to his crimes; and (3) the cumulative effect of the errors in his case required a new trial.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In 2010, petitioner was indicted on two counts of purchasing a child; three counts of first-degree sexual abuse; one count of first-degree sexual assault; and four counts of sexual abuse by a custodian. The charges stemmed from the claim that petitioner offered $15,000 to $20,000 to his daughter-in-law to purchase custody of his granddaughters, then four-year-old A.A. and two-year-old K.J., and had abused/assaulted his step-granddaughter, A.P.

In August of 2011, petitioner's first jury trial ended in a mistrial. Petitioner's second jury trial commenced in November of 2011. All counts in the indictment were tried together. During

---

[1] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W.Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W.Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W.Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123 (1990).

jury voir dire, several prospective jurors indicated their skepticism about their ability to find a defendant guilty of a crime based solely on the uncorroborated testimony of a child. Noting that the law allows for a guilty verdict based on such evidence, the circuit court excused the prospective jurors from further service.

At trial, the State presented several witnesses, including petitioner's daughter-in-law, Sylvia A.; petitioner's granddaughters; a licensed social worker specializing in children's counseling and play therapy, Phyllis Hasty; a Child Protective Services worker, Christopher Bell; and three law enforcement officers. At the conclusion of the jury's deliberation, petitioner was found guilty of two counts of purchasing a child, three counts of sexual abuse in the first degree, four counts of sexual abuse by a custodian, and one count of sexual assault in the first degree.

Following a sentencing hearing, the trial court sentenced petitioner to consecutive prison terms of one to five years for each of the counts of purchasing a child; one to five years for each count of sexual abuse; ten to twenty years for each count of sexual abuse by a custodian; and twenty-five to one hundred years for the count of sexual assault. The trial court ordered the sentences for the three counts of sexual abuse by a custodian and the sexual assault count suspended, pending a five-year period of probation upon discharge of the remaining counts. Therefore, petitioner received an effective sentence of fifteen to forty-five years in the penitentiary. A "motion for reconsideration" was denied.[2] Thereafter, petitioner appealed his conviction and sentence to this Court, which denied the appeal by memorandum decision. *See State v. Mark Lynn J.*, No. 12-0272, 2013 WL 3185087 (W.Va. June 24, 2013) (memorandum decision).

In 2013, petitioner, pro se, filed a petition for writ of habeas corpus in the circuit court, alleging ineffective assistance of trial counsel; excessive sentence; prosecutorial misconduct; and improper jury instructions. Following the appointment of counsel, petitioner's counsel filed an amended petition alleging ineffective assistance of trial counsel; disproportionate sentence; and cumulative error. Respondent filed a response in which it argued that petitioner was not entitled to habeas corpus relief. According to respondent, none of petitioner's allegations of ineffective assistance of counsel, if true and if viewed individually or collectively, would likely have changed the outcome of the trial and that his prison term was not disproportionate to his conviction of sex crimes against children.

In December of 2014, the circuit court held an omnibus evidentiary hearing. At that hearing, the circuit court informed petitioner of the finality of his habeas petition and waiver checklist. The circuit court proceeded to hear testimony from petitioner, petitioner's wife, and petitioner's trial counsel, Robert Holroyd. At the conclusion of the hearing, the circuit court took the matter under advisement. By order entered on September 23, 2015, the circuit court entered its order denying habeas relief to petitioner. The circuit court found that petitioner's trial counsel was not ineffective; his sentence was not disproportionate to his crimes; and his claim of cumulative error was without merit. This appeal followed.

---

[2]The Court notes that the West Virginia Rules of Criminal Procedure do not provide for a "motion for reconsideration" in criminal proceedings. Rule 35 of the West Virginia Rules of Criminal Procedure allows a court to correct and/or reduce a previously imposed sentence.

This Court reviews appeals of circuit court orders denying habeas relief under the following standard:

> "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syllabus point 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, *State ex rel. Franklin v. McBride*, 226 W.Va. 375, 701 S.E.2d 97 (2009). Further, a habeas petitioner bears the burden of establishing that he is entitled to the relief sought. *See Markley v. Coleman*, 215 W.Va. 729, 734, 601 S.E.2d 49, 54 (2004); Syl. Pts. 1 and 2, *State ex rel. Scott v. Boles*, 150 W.Va. 453, 147 S.E.2d 486, 487 (1966).

On appeal, petitioner raises three grounds for relief: ineffective assistance of counsel; disproportionate sentencing; and cumulative error. Petitioner's arguments to this Court are largely identical to the arguments he made to the circuit court in his underlying habeas action. Upon our review and consideration of the parties' arguments, the record on appeal, and pertinent legal authority, we find no error in the circuit court's order denying petitioner post-conviction habeas corpus relief. Indeed, the circuit court's 126-page order includes well-reasoned findings and conclusions as to the assignments of error raised in this appeal. Given our conclusion that the circuit court's order and the record on appeal reflect no clear error, we hereby adopt and incorporate the circuit court's findings and conclusions as they relate to petitioner's assignments of error raised herein and direct the Clerk to attach to this memorandum decision a copy of the circuit court's September 23, 2015, "Order Denying the Petitioner's Petition for Writ of Habeas Corpus Ad Subjiciendum and Removing It from the Court's Active Docket[.]"

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** February 21, 2017

**CONCURRED IN BY:**

Chief Justice Allen H. Loughry II
Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Elizabeth D. Walker

NOTED CIVIL DOCKET

SEP 23 2015

JULIE BALL
CLERK CIRCUIT COURT
MERCER COUNTY

15-1034

**IN THE CIRCUIT COURT OF MERCER COUNTY, WEST VIRGINIA.**

**STATE OF WEST VIRGINIA,** *ex rel,*
**MARK J** ,                                                        **PETITIONER,**

v.                           **Civil Action No. 13-C-431-DS**

**DAVID BALLARD, Warden**
**MT. OLIVE CORRECTIONAL COMPLEX,**                    **RESPONDENT.**

## ORDER DENYING THE PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS AD SUBJICIENDUM AND REMOVING IT FROM THE COURT'S ACTIVE DOCKET

On December 17, 2014, this matter came before the Court, the Honorable Derek C. Swope presiding, for a hearing on the Petitioner's Petitions for Writ of Habeas Corpus Relief, brought pursuant to the provisions of Chapter 53, Article 4A of the West Virginia Code, as amended, which were filed by the Petitioner, *pro se,* and also by and through his court-appointed counsel, Paul R. Cassell, Esq. The Petitioner filed a *pro se* Petition for Writ of Habeas Corpus on October 25, 2013. Counsel for the Petitioner filed an Amended Petition for Writ of Habeas Corpus on October 17, 2014. The State filed a Response on July 1, 2015. The Petitioner and his counsel appeared for the omnibus hearing. John McGinnis, IV, Esq., Assistant Prosecuting Attorney, appeared on behalf of the State of West Virginia. The Petitioner filed an affidavit in support of his Petition on September 17, 2015.

The Petitioner is seeking post-conviction habeas corpus relief from his February 2, 2012, sentence for the indeterminate terms of not less than one (1) nor more than five (5) years for each offense of Purchasing a Child contained in Count 1 and 2 of the State's indictment; not less than one (1) nor more than five (5) years for each offense of Sexual Abuse – First Degree contained in Counts 3, 5 and 7 of the State's indictment; not less than ten (10) nor more than twenty (20)

1

years for each offense of Sexual Abuse by a Custodian contained in Counts 4, 6, 8 and 10 of the State's indictment; and not less than twenty-five (25) nor more than one hundred (100) years for the offense of Sexual Assault -First Degree contained in Count 9 of the State's indictment, absent a showing that he is being unlawfully detained due to prejudicial constitutional errors in the underlying criminal proceedings.

Whereupon, the Court, having reviewed and considered the Petitions, the Response, the Court files, the transcripts, the argument of counsel, the affidavit, and the pertinent legal authority, does hereby **DENY** the Petitioner's Petition for Writ of Habeas Corpus Relief.

In support of the aforementioned ruling, the Court makes the following General Findings of Fact and Conclusions of Law:

## I.     FACTUAL/PROCEDURAL HISTORY: Case No. 10-F-91

### A. The Indictment

On February 10, 2010, the Grand Jury for Mercer County, West Virginia, returned an indictment against the Petitioner charging him with two (2) counts of Purchasing a Child, three (3) counts of Sexual Abuse – First Degree, four (4) counts of Sexual Abuse by a Custodian, and one (1) count of Sexual Assault – First Degree . This action was assigned to the Honorable William J. Sadler.

### B. The Pre-Trial Proceedings

Upon the return of the above-referenced indictment, the Circuit Clerk of Mercer County, sent a written Notice to the Petitioner to appear for arraignment on February 22, 2010. The Petitioner retained Robert E. Holroyd, Esq., to represent him. The Petitioner was released on a personal recognizance bond of $5,000.00.

2

Mr. Holroyd filed a motion for discovery and inspection on February 23, 2010, which triggered the State's discovery request filed on February 26, 2010. On March 30, 2010, the State filed its Notice of Hearing and motion for taking the testimony of a child witness by closed circuit television. Teresa Jarrell, Psychologist, was appointed to evaluate the child and submit a written report containing her opinions to the Court.

On April 29, 2010, the Court ordered that Phyllis Hasty be permitted and authorized to disclose her entire counseling files for the victims, C, R, and A. P, to Judge Sadler for review. The Court conducted an in-camera evaluation of those records and found that they should be forwarded to the attorneys for the parties. Judge Sadler ordered a hearing on whether to allow remote testimony on September 13, 2010.

On September 14, 2010, Judge Sadler transferred this matter to the undersigned Judge because the former judge had served as the Prosecuting Attorney of Mercer County during the period when some of the crimes charged in the indictment were alleged to have occurred.

The undersigned Judge conducted several hearings on the issue of 404(b) evidence proffered by the State, provisionally ruling it admissible, subject to making certain findings at trial. The Court also denied the State's motion to prevent the Petitioner from introducing hearsay portions of his statement. On June 29, 2011, the Court denied the Petitioner's motion to dismiss Counts 1 and 2.

**C. The First Trial**

This matter was tried to a jury on August 23 through August 25, 2011 and resulted in a mistrial when the jury could not reach a decision. It was rescheduled for trial on

3

November 1, 2011. During the first trial the Court also made a final ruling that the State could use the proffered 404(b) evidence. The defense was prohibited from mentioning to the jury that the Grand Jury for the February 2007 Term did not return a True Bill against the Petitioner for the charges alleged in the 2010 indictment. The Petitioner's counsel reserved his objection to the Court's ruling.

## D. The Second Trial

This matter was tried again from November 1 through November 3, 2011. At the conclusion of the trial, the Defendant was found guilty of two (2) counts of Purchasing a Child, four (4) counts of Sexual Abuse – First Degree, three (3) counts of Sexual Abuse by a Custodian, and one (1) count of Sexual Assault – First Degree.

## E. Sentencing

Pursuant to the penalties prescribed by the West Virginia Code for the above offenses, on February 2, 2012, the undersigned sentenced the Petitioner as follows:

> That the defendant, Mark Lynn J    , be taken from the bar of this Court to the Southern Regional Jail and therein confined until such time as the warden of the penitentiary can conveniently send a guard for him, and that he be taken from the Southern Regional Jail to the penitentiary of this State and therein confined for the indeterminate term of not less than one (1) nor more than five (5) years as provided by law for each offense of "Purchasing a Child" as the State in Count 1 and 2 of its Indictment herein hath alleged and by a jury hath found; not less than one (1) nor more than five (5) years as provided by law for each offense of "Sexual Abuse – First Degree" as the State in Counts 3, 5 and 7 of the Indictment herein hath alleged and by a jury hath found; not less than ten (10) nor more than twenty (20) years as provided by law for each offense of "Sexual Abuse by a Custodian" as the State in Counts 4, 6, 8 and 10 of its Indictment herein hath alleged and by a jury hath found; and not less than fifteen (15) nor more than thirty-five (35) years as provided by law for the offense of "Sexual Assault – First Degree" as the State in Count 9 of its Indictment herein hath alleged and by a jury hath found; that these sentences run consecutively with one another and that he be dealt with in

4

accordance with the rules and regulations of that institution and the laws of the State of West Virginia.

After due consideration, it is the further **ORDER** and **DECREE** of this Court that imposition of the defendant's sentences imposed as to all Counts with the exception of Count 9 be suspended, and that when the defendant is discharged from the penitentiary with regard to his remaining sentence of 15-35 years imposed as to Count 9, he shall be placed on probation for a period of five (5) years with the following specific conditions:

1. That the defendant pay his court costs within one (1) year of his release from incarceration of his driver's license will be subject to suspension;

2. That the defendant obey all laws;

3. That the defendant not use any alcohol/drugs, or have any in his possession, unless prescribed by a physician;

4. That the defendant be subject to random urinalysis;

5. That the defendant not associate with anyone who abuses drugs/alcohol or convicted felons;

6. That the defendant not frequent places where drugs/alcohol are served or used;

7. That the defendant comply with all requirements of the sexual offender registry.

The Court advises defendant of his obligation to register with the sexual offender registry and it is the **ORDER** and **DECREE** of this Court that the defendant be supervised as a sexual offender for the remainder of his life.

Thereafter the parties returned before the Court. Whereupon, the Court finds defendant's victim as to Count 9 of the Indictment was younger than twelve (12) years of age; therefore, it is the **ORDER** and **DECREE** of this Court that the aforementioned sentences be set aside and the Court proceeds to re-sentence the defendant; therefore, it is the **ORDER** and **DECREE** of this Court that the defendant, Mark Lynn J      ., be taken from the bar of this Court to the Southern Regional Jail and therein confined until such time as he warden of the penitentiary can conveniently send a guard for him, and that he be taken from the Southern Regional Jail to the penitentiary of this State and therein confined for the

indeterminate terms of not less than one (1) nor more than five (5) years as provided by law for each offense of "Purchasing a Child" as the State in Counts 1 and 2 of its Indictment herein hath alleged and by a jury hath found; not less than one (1) nor more than five (5) years as provided by law for each offense of "Sexual Abuse – First Degree" as the State in Counts 3, 5 and 7 of the Indictment herein hath alleged and by a jury hath found; not less than ten (10) nor more than twenty (20) years as provided by law for each offense of "Sexual Abuse by a Custodian" as the State in Counts 4, 6, 8 and 10 of its Indictment herein hath alleged and by a jury hath found; and not less than twenty-five (25) nor more than one hundred (100) years as provided by law for the offense of "Sexual Assault – First Degree" as the State in Count 9 of its Indictment herein hath alleged and by a jury hath found; that these sentences run consecutively with one another; and that he be dealt with in accordance with the rules and regulations of that institution and the laws of the State of West Virginia.

After due consideration, it is the further **ORDER** and **DECREE** of this Court that imposition of the defendant's sentences imposed as to Count 6, 8, 9 and 10 be suspended, and that when the defendant is discharged from the penitentiary with regard to his remaining sentences imposed as to Counts 1, 2, 3, 4, 5, and 7, he shall be placed on probation for a period of five (5) years with the following specific conditions:

1.  That the defendant pay his court costs within one (1) year of his release from incarceration or his driver's license will be subject to suspension;

2.  That the defendant obey all laws;

3.  That the defendant not use any alcohol/drugs, or have any in his possession, unless prescribed by a physician;

4.  That the defendant be subject to random urinalysis;

5.  That the defendant not associate with anyone who abuses drugs/alcohol or convicted felons;

6.  That the defendant not frequent places where drugs/alcohol are served or used;

7.  That the defendant comply with all requirements of the sexual offender registry.

6

The Court advises defendant of his obligation to register with the sexual offender registry and it is the **ORDER** and **DECREE** of this Court that the defendant be supervised as a sexual offender for the remainder of his life.

### F. The Appeal

On February 23, 2012, the Petitioner filed his Notice of Appeal to the West Virginia Supreme Court of Appeals. On July 29, 2013, the West Virginia Supreme Court of Appeals issued a Mandate affirming the Petitioner's conviction by Memorandum Decision rendered on June 24, 2013.

### G. Post-Conviction Matters

The Defendant has filed two motions for reconsideration, which were each denied.

## II. THE PETITIONER'S *PRO SE* PETITION UNDER W. VA. CODE §53-4a-1 FOR WRIT OF HABEAS CORPUS; THE PETITIONER'S AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND MEMORANDUM IN SUPPORT OF AMENDED PETITION FOR WRIT OF HABEAS CORPUS; THE *LOSH* CHECKLIST; THE STATE'S RESPONSE; THE OMNIBUS HEARING

### A. The *Pro Se* Petition: Civil Action No. 13-C-431

On October 25, 2013, the Petitioner filed his Petition for Writ of Habeas Corpus in the Circuit Court of Mercer County. The Petitioner raised the following grounds therein:

1. Ineffective assistance of counsel in that he failed to investigate the facts of the Petitioner's case which he is actually innocent of the charges. His attorney knew from the first mistrial that there were witnesses and evidence that he could have obtained that would support his actual innocence.

2. Excessive sentence.

7

3. Prosecutorial misconduct in that the Prosecutor made improper comments to the jury that were inflammatory and misleading during the trial in her closing arguments.

4. Improper jury instructions.

The Court appointed Paul R. Cassell, Esq., to represent the Petitioner in this proceeding.

**B. The Amended Petition for Writ of Habeas Corpus and Memorandum in Support of Amended Petition for Writ of Habeas Corpus**

On October 17, 2014, the Petitioner, by counsel filed an Amended Petition for Writ of Habeas Corpus. It raised the following grounds:

1. Petitioner's trial counsel was ineffective in the following ways:

   a. Failure to seek a severance of the charges;

   b. Voir dire;

   c. Addressing the testimony of Phyllis Hasty;

   d. With regard to Defendant's Exhibits 1 and 2;

   e. Permitting irrelevant and other inadmissible evidence;

   f. Pre-trial publicity;

   g. Conducting an inadequate investigation;

   h. Needlessly and prejudicially referencing to the previous trial;

   i. Needlessly opening the door to recitation of the otherwise inadmissible forensic interview of A.P.;

   j. With regard to improper comments by the Prosecutor.

2. The Petitioner' Federal and State Constitutional Rights were violated by his disproportionate sentence.

3. The Petitioner's Federal and State Constitutional Rights were violated by the cumulative effect of the errors during the course of his representation at the trial level.

4. The Petitioner's hereby reasserts all additional grounds raised in his *Losh* checklist and the prior pleadings filed herewith.

The Petitioner requested that the Court issue a writ of habeas corpus on his behalf.

## C. THE *LOSH* CHECKLIST

Counsel also filed the *Losh* checklist on October 17, 2014 with grounds as follows:

**Waived Grounds:**

In his *Losh* checklist the Petitioner waived the following grounds for relief:

- Statute under which conviction was obtained was unconstitutional

- Indictment shows on face no offense was committed

- Denial of right to speedy trial

- Involuntary guilty plea

- Mental competency at time of crime

- Mental competency at time of trial

- Incapacity to stand trial due to drug use

- Language barrier to understanding the proceeding

- Denial of counsel

- Failure of counsel to take an appeal

- Consecutive sentences for same transaction

- Coerced confessions

- Suppression of helpful evidence by prosecutor

9

- State's knowing use of perjured testimony

- Falsification of a transcript by prosecutor

- Unfulfilled plea bargains

- Information in pre-sentence report erroneous

- Double jeopardy

- Irregularities in arrest

- Excessiveness or denial of bail

- No preliminary hearing

- Illegal detention prior to arraignment

- Irregularities or errors in arraignment

- Challenges to the composition of grand jury or its procedures

- Failure to provide copy of indictment to defendant

- Improper venue

- Pre-indictment delay

- Refusal of continuance

- Refusal to subpoena witnesses

- Prejudicial joinder of defendants

- Nondisclosure of Grand Jury minutes

- Refusal to turn over witness notes after witness has testified

- Claim of incompetence at time of offense, as opposed to time of trial

- Claims concerning use of informers to convict

- Instructions to the jury

- Claims of prejudicial statement by trial judges

10

- Acquittal of co-defendant on same charge

- Defendant's absence from part of the proceedings

- Improper communications between prosecutor or witnesses and jury

- Question of actual guilt upon an acceptable guilty plea

- Mistaken advice of counsel as to parole or probation eligibility

- Amount of time served on sentence, credit for time served

## Asserted Grounds:

The Petitioner asserted the following *Losh* grounds:

- Trial court lacked jurisdiction (TN)

- Prejudicial pretrial publicity

- Ineffective assistance of counsel

- Defects in indictment (specificity)

- Lack of full public hearing (ct. room may have been cleared)

- Constitutional errors in evidentiary rulings

- Claims of prejudicial statements by prosecutor

- Sufficiency of evidence

- Severer sentence than expected

- Excessive sentence

## D. THE STATE'S RESPONSE TO THE AMENDED PETITION AND MEMORANDUM IN SUPPORT THEREOF

On July 1, 2015, the State of West Virginia filed its Response to the Petitioner's Petitions for Writ of Habeas Corpus. The Response is more fully set out in the court's findings, *infra*:

11

## E. THE OMNIBUS HABEAS CORPUS HEARING

The Omnibus Habeas Corpus hearing occurred on December 12, 2014, before the Honorable Derek C. Swope. Paul R. Cassell, Esq. appeared on behalf of the Petitioner who was also present in person. John H. McGinnis, Esq. appeared on behalf of the State of West Virginia. The Court fully informed the Petitioner of the finality of his omnibus habeas corpus petition and reviewed the *Losh* checklist with him.

Upon review of this information, the Court heard testimony from witnesses called on behalf of the Petitioner. The Court also reviewed the opinion from the West Virginia Supreme Court of Appeals in the underlying criminal case with the Petitioner, informing him of those grounds that were precluded as having been addressed by that court.

The Petitioner testified in his own behalf. He stated that he had reviewed the habeas petition with his habeas attorney. He denied committing any of the offenses for which he was charged and convicted. He stated that he had met with his trial counsel, Robert E. Holroyd, Esq., and reviewed the trial strategy with him to some degree. He said that it was "up in the air." Mr. Holroyd discussed the matter of his testifying with the Petitioner, but the discussion was very limited. He believed that he spent approximately 5 to 10 minutes discussing his testimony with Mr. Holroyd.

He also reviewed the witnesses that he wished to call with Mr. Holroyd. He wanted to call his wife and son. His son testified in the first trial which ended in a mistrial, but did not testify in the second trial. He also told him about his nieces. They would have testified that he never bothered them. His wife was present for most of the meetings with Mr. Holroyd. He disclosed other evidence to Mr. Holroyd that showed that the girls had

12

been coached in their testimony. He also disclosed that he had been involved in raising the children who had allegedly been kidnapped. There were no other witnesses who alleged that the children had been coached. There was never any discussion of a severance of the trials. He also saw Sylvia (the alleged victim's mother) sign the documents in question which he believed would demonstrate he had visitation with and/or custody of the children.

Mr. Holroyd did not discuss the grounds for appeal with him. He never met with Jay Williams (additional appellate counsel). The Petitioner raised the ground that the court lacked jurisdiction because his habeas counsel believed that he should as the children alleged that some of the incidents took place in Tennessee. He stated that there was prejudicial pretrial testimony because there were articles in the newspaper about his case. He stated that there were other ineffective assistance of counsel grounds raised in his Memorandum. He also said that the indictment lacked specificity. He stated that he had not gotten a public hearing because the Court asked people to leave so that the attorneys could talk. That ground was based on the Court's sequestration of witnesses and conducting legal arguments out of the presence of the jury. His ground of constitutional errors and evidentiary rulings was raised in the brief as was his grounds of prejudicial statements made by the prosecutor. As far as regarding sufficiency of the evidence he did not do the crime and did not believe there was sufficient evidence to convict him. He raised the grounds of severer sentence than expected and excessive sentence based upon the advice of his habeas counsel.

The Petitioner called his wife K        J        on his behalf. She testified that she attended all of the meetings which the Petitioner had with Mr. Holroyd before each

13

trial. She felt that Mr. Holroyd had not prepared in any way to get her husband off for these charges. No time was spent preparing the Petitioner to testify. The Petitioner cannot hear very well and has problems processing information. They have been married approximately 30 years. She did not believe that the Petitioner was thinking about what he was saying when he testified. He had no clue how much time he got from the sentence. During his meetings with Mr. Holroyd there were no discussions about trial strategy. They raised some issues that they thought would be important to be presented at the trial, particularly, Sylvia's parenting skills, including her problems with the cleanliness of her home, her overdosing and the poor feeding habits she had for the children. Mrs. J testified about how much time she and the Petitioner had the children and that they would not know where their mother was. There were custody and visitation agreements in which they gave the mother $500.00 to see the children. One of these documents was admitted at trial because she had seen Sylvia sign it. Mrs. J was not called as a witness and could have identified the other document.

She raised concerns with Mr. Holroyd about the children being coached. That was never investigated. They had issues with A (one of the children) having prior sexualized behavior. A stated that her parents showed her about sexual behavior. A learned to do this from watching her mother on the internet. She also discussed the testimony of C R . She also testified that A told her that her parents were coaching her to say that the Petitioner had done something wrong to her. A told them that her real father had actually abused her. Mrs. J told the child's mother about this allegation but she did not think it was true. They told Mr. Holroyd about these issues and he did not do anything about it.

14

Mrs. J          also testified that she witnessed the children being coached in the hallway by a representative of the Prosecuting Attorney's Office and the play therapist. None of these matters were investigated by Mr. Holroyd. She felt the trial was a laughing stock, and stated that one of the jurors talked to the Petitioner and her before they started the trial.

On cross examination she stated that they talked to Mr. Holroyd at least four (4) times before the first trial and there were probably a total of six meetings with Mr. Holroyd and each of them was fifteen (15) to twenty (20) minutes in length. They spent more time talking about old cases. She saw Mr. Holroyd make notes. At the second trial, Mr. Holroyd just called two (2) witnesses.

Robert Holroyd, Esq. testified on behalf of the State. He stated that he became involved in the case shortly after it began. He turned over most of his file to Mr. Williams. He met with the Petitioner and his wife to tell them about the nature of the charges and to find out what their side was. He discussed the elements of the case and had more than one long discussion about what witnesses to bring in. He did not want to do anything that would help the prosecution. He said it is his observation that too many defense counsel assist the prosecution by putting on witnesses that really do not help the issue, but make them subject to the State's inquiry. He believed that some of the witnesses whom the Petitioner wanted to call could create those kinds of problems. Mrs. J          was very involved in the discussions, and there were numerous telephone conversations and letters. He believed that they understood what he intended to do at trial. They were thrilled after the first trial ended in a hung jury. They seemed very pleased with that.

15

The Petitioner also raised the issue that Mr. Holroyd did not call the Petitioner's son at the second trial. Mr. Holroyd did not believe that he added anything to the first trial. He said that he did not call the nieces because "just because you call people in to say he hasn't done anything, it doesn't help because it's not a defense." He was afraid of calling additional witnesses and opening doors. One of the victims testified that nothing happened. He was not going to call an expert against Phyllis Hasty because that would not have been to any advantage.

Even though the written document, Exhibit 1, did not come in, both the client and his wife testified that there was plenty of testimony to show she had signed it without the document actually being entered into evidence. Mr. Holroyd stated that he believed that in both cases the juries were properly picked. He never received instructions from the Petitioner to take off any particular juror.

On cross examination he stated that he does not remember what particular concerns he had about collateral damage coming in from potential defense witnesses. He could not put his finger on any particular evidence that would be damning to his client from a defense witness. He did not hire an investigator to interview the witnesses suggested by the Petitioner. He had a phone conversation with the Petitioner's son. He did not believe calling witnesses to say that the Petitioner did not have lascivious intent toward children would have helped because he believed he had a defense based on the fact that the Petitioner was trying to take the children out of an abusive situation. He was questioned about the differences between what the children told Phyllis Hasty and their testimony at trial. He was questioned about the voir dire. He does not specifically remember going over the Petitioner's testimony with him, but he is sure that he did so.

16

The Court took the matter under advisement pending receipt of additional affidavits from the Petitioner.[1]

## III.    DISCUSSION

### A.    HABEAS CORPUS DEFINED

Habeas Corpus is a "suit wherein probable cause therefore being shown a writ is issued which challenges the right of one to hold another in custody or restraint." Syl. Pt. 1. *State ex rel. Crupe v. Yardley*, 213 W. Va. 335, 582 S.E.2d 782 (2003).   The issue presented in a Habeas Corpus proceeding is "whether he is restrained of his liberty by due process of law." *Id. At* Syl. Pt. 2.  "A Habeas Corpus petition is not a substitute for writ of error[2] in that ordinary trial error not involving constitutional violations will not be reviewed." *Id. At* Syl. Pt. 3.

### B.    THE AVAILABILITY OF HABEAS CORPUS RELIEF

In *State ex rel. McCabe v. Seifert*, the West Virginia Supreme Court of Appeals delineated the circumstances under which a post-conviction Habeas Corpus hearing is available, as follows:

(1)    Any person convicted of a crime and

(2)    Incarcerated under sentence of imprisonment therefore who contends

(3)    That there was such a denial or infringement of his rights as to render the conviction or sentence void under the Constitution of the United States or the Constitution of this State or both, or

---

[1] On September 17, 2015, Petitioner's counsel filed the affidavit of Misty Ellis, which states, in pertinent part that the affiant has always acted appropriately around children, and that she would not hesitate to let the Petitioner be around her children even after his conviction on these charges.

[2] A writ of error issued by an appellate court to the court of record where a case was tried, requiring that the record of the trial be sent to the appellate court for examination of alleged errors.

17

(4)     That the court was without jurisdiction to impose the sentence, or

(5)     That the sentence exceeds the maximum authorized by law, or

(6)     That the conviction or sentence is otherwise subject to collateral attack upon any ground of alleged error heretofore available under the common-law or any statutory provision of this State, may without paying a filing fee, file a petition for a writ of Habeas Corpus Ad Subjiciendum, and prosecute the same, seeking release from such illegal imprisonment, correction of the sentence, the setting aside of the plea, conviction and sentence, or other relief. 220 W. Va. 79 640 S.E.2d 142 (2006); W. Va. Code §53-4A-1(a)(1967)(Repl. Vol. 2000).

Our post-conviction Habeas Corpus statute, W. Va. Code §53-4A-1 *et seq.*, "clearly contemplates that a person who has been convicted of a crime is ordinarily entitled, as a matter of right, to only one post-conviction Habeas Corpus proceeding during which he must raise all grounds for relief which are known to him or which he could, with reasonable diligence, discover." Syl. Pt. 1, *Gibson v. Dale*, 173 W. Va. 681, 319 S.E.2d 806 (1984). At subsequent Habeas Corpus hearings, any grounds raised at a prior Habeas Corpus hearing are considered fully adjudicated and need not be addressed by the Court. *Losh v. McKenzie*, 166 W. Va. 762, 277 S.E.2d 606 (1981).

Yet, some limited exceptions apply to this general rule: "[a] prior omnibus Habeas Corpus hearing is *res judicata* as to all matters raised and as to all matters known or which with reasonable diligence could have been known; however an applicant may still petition the court on the following grounds: (1) ineffective assistance of counsel at the omnibus Habeas Corpus hearing; (2) newly discovered evidence; (3) or, a change in the law, favorable to the applicant, which may be applied retroactively." Syl. Pt. 4, *Losh v. McKenzie*, 166 W. Va. 762, 277 S.E.2d 606 (1981).[3]

---

[3] On June 16, 2006, the West Virginia Supreme Court of Appeals held that a fourth ground for Habeas relief may exist in cases involving testimony regarding serology evidence. To summarize, the Court held as follows:

18

A Habeas Corpus proceeding is civil in nature. "The general standard of proof in civil cases is preponderance of the evidence." *Sharon B.W. v. George B.W.*, 203 W. Va. 300, 303, 507 S.E.2d 401, 404 (1998).

The West Virginia Supreme Court of Appeals has articulated the way for a Circuit Court to review Habeas Corpus petitions: "Whether denying or granting a petition for a writ of Habeas Corpus, the circuit court must make adequate findings of facts and conclusions of law relating to each contention advanced by the petitioner, and state the grounds upon which the matter was determined." *Coleman v. Painter*, 215 W. Va. 592, 600 S.E.2d 304 (2004).

## C. FINAL LIST OF GROUNDS ASSERTED FOR ISSUANCE OF A WRIT OF HABEAS CORPUS, AND THE COURT'S RULINGS THEREON

The Court has carefully reviewed all of the pleadings filed in this action, the transcripts of the omnibus hearing, the Court files in the underlying criminal action, the transcripts of the trial and hearings, and the applicable case law. The Court has also reviewed the *Losh* checklist filed by the Petitioner with his Amended Petition for Writ of Habeas Corpus.

The matters before this Court for review are:

1. Whether the Petitioner's Federal and State Constitutional Rights were violated by his trial counsel's ineffective assistance on the following grounds:

---

A prisoner who was convicted between 1979 and 1999 and against whom a West Virginia State Police Crime serologist, other than a serologist previously found to have engaged in intentional misconduct, offered evidence may bring a petition for writ of Habeas Corpus based on the serology evidence even if the prisoner brought a prior Habeas Corpus challenge to the same serology evidence and the challenge was finally adjudicated.

*In re Renewed Investigation of State Police Crime Laboratory, Serology Div.*, 633 S.E.2d 762, 219 W. Va. 408 (2006).

a.    Trial counsel was ineffective by failing to seek a severance of the charges;

b.    Trial counsel was ineffective in voir dire;

c.    Trial counsel was ineffective in addressing the testimony of Phyllis Hasty;

d.    Trial counsel was ineffective with regard to dealing with Defendant's Exhibits 1 and 2;

e.    Trial counsel was ineffective in permitting irrelevant and other inadmissible evidence;

f.    Trial counsel did not effectively raise the issue of adverse pre-trial publicity;

g.    Trial counsel failed to conduct an adequate investigation;

h.    Trial counsel needlessly and prejudicially referenced the previous trial;

i.    Trial counsel needlessly opened the door to recitation of the otherwise inadmissible forensic interview of A.P.;

j.    Trial counsel was ineffective with regard to improper comments by the Prosecutor.

2. Whether the Petitioner' Federal and State Constitutional Rights were violated by his disproportionate sentence.

3. Whether the Petitioner's Federal and State Constitutional Rights were violated by the cumulative effect of the errors during the course of his representation at the trial level.

4. Whether the other grounds raised by the Petitioner in his *Losh* checklist and the prior pleadings entitle him to relief, specifically, whether the trial court lacked jurisdiction, whether there was prejudicial pretrial publicity, whether there were defects in the indictment (specificity), whether there was the lack of a full public hearing,

20

whether the trial court made constitutional errors in its evidentiary rulings, whether the prosecutor made prejudicial statements, and whether there was sufficient evidence to sustain the Petitioner's conviction.

## 1. WAS COUNSEL INEFFECTIVE?

**PETITIONER'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE INEFFECTIVE ASSISTANCE OF HIS TRIAL COUNSEL**

### a. The Petitioner's Argument[4]

The West Virginia Supreme Court has recognized that the Sixth Amendment to the Constitution of the United States and Article 3, Section 14 of the Constitution of West Virginia mandates that a Defendant, in a criminal proceeding receive "competent and effective assistance of counsel." *State ex. Rel. Strogen v. Trent,* 469 S.E.2d 7, 9-10 (W.Va. 1996) (numerous citations omitted).

According to the Supreme Court, claims of ineffective assistance of counsel are to be governed by the two prong test established by the United States Supreme Court in *Strickland v. Washington,* 466 US 668 (1984): (1) counsel's performance was deficient under an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Id.* at 12. The West Virginia Supreme Court has established that in reviewing counsel's performance, Courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance. *Id.*

---

[4] All Exhibits referenced in this section of the Order relate to those filed with the pleadings of the parties.

21

"Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue." *Id.* (citations omitted).

Importantly, the West Virginia Supreme Court has recognized, just as the United States Supreme Court recognized earlier, that any presumption that counsel's conduct does fall within the range of reasonable professional assistance does not apply where counsel's strategic decisions are made after an inadequate investigation. *State ex rel. Vernatter v. Warden*, 528 S.E. 2d 207, 213 (W. Va. 1999), citing *State ex. Rel. Daniel v. Legursky*, 465 S.E. 2d 416, 422 (W. Va. 1995).

The Court has stated that "counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary." *State ex. Rel. Daniel v. Legursky*, 465 S.E. 2d 416, 422 (W. Va. 1995). The West Virginia Supreme Court has recognized that in applying the standard, "courts . . . have found no difficulty finding ineffective assistance of counsel where an attorney neither conducted a reasonable investigation nor demonstrated a strategic reason for failing to do so." *Id.* at 422.

### 1. TRIAL COUNSEL WAS INEFFECTIVE WITH REGARD TO FAILING TO SEEK A SEVERANCE ON THE CHARGES.

Petitioner's trial involved two separate and distinct alleged occurrences. First, it was alleged that Petitioner attempted to purchase his grandchildren from their mother on or about December 12, 2006. (Ex. 2). Second, it was alleged that Petitioner sexually abused a child between March 2007 and February 2008. (Ex. 2). The two incidents had nothing to do with each other and involved different alleged victims (A.A. and K.J. for the first occurrence; A. P. for the second). Despite the fact that the

22

trial court expressed reservations about trying the cases together, trial counsel never sought to sever. (Ex. 3, Ex. 11 at pp. 6-7; Ex. 12 at pp. 5-6, 11-14, Ex. 15 at 5).

The West Virginia Supreme Court of Appeals has provided substantial guidance as to when a trial court should grant a severance. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character. All offenses based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan shall be charged in the same indictment or information in a separate count for each offense, whether felonies or misdemeanors or both. *See State v. Hatfield*, 181 W. Va. 106, 108-109, 380 S.E.2d 670, 672-673 (1988), *citing State v. Eye*, 177 W. Va. 671, 355 S.E.2d 921 (1987); *State v. Miller*, 168 W. Va. 531, 285 S.E.2d 376 (1981).

The West Virginia Rules of Criminal Procedure, R. 14 grants a defendant the right to seek a severance of offenses:

**Rule 14. Relief from prejudicial joinder.**

**(a) Offenses.**

It appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of the counts or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the state to deliver to the court for inspection in camera any statements or confessions made by the defendant or other relevant information which the state intends to introduce in evidence at the trial.

23

Even where joinder of offenses is proper, the trial court may order separate trials pursuant to Rule 14(a) on the ground that such joinder or consolidation is prejudicial. *Hatfield*, at 110, 674 *citing State v. Clements*, 175 W. Va. 463, 334 S.E.2d 600, *cert. denied*, 474 U.S. 857, 106 S.Ct. 165, 88 L. Ed. 2d 137 (1985); *State v. Mitter*, 285 S.E.2d at 383.

In *State v. Mitter*, the West Virginia Supreme Court of Appeals recognized the circumstances in which prejudice may arise from an otherwise proper joinder of offenses:

> Courts that have addressed the problem have recognized that joinder or consolidation may prejudice the defendant because the jury may tend to cumulate the evidence of the various offenses and convict the defendant on all offenses charged on the theory he is a bad individual rather than weigh the evidence separately on each offense. From the defense standpoint, trial on multiple offenses may make it difficult to establish separate defenses to individual charges. Furthermore, it may inhibit the defendant's ability to testify on his own behalf if he wishes to testify about some of the charges but not about others.

*Hatfield* at 110-111, 674-675. (citations omitted).

It is incumbent upon a trial judge to consider in some depth a motion to grant a severance if: (a) a joint trial will raise so many issues that a jury may conclude that the defendant is a "bad man" and must have done something, and consequently will convict him as a "bad man" rather than on a particular charge; (b) if one offense may be used to convict him of another, though proof of that guilt would have been inadmissible at a separate trial; and (c) the defendant may wish to testify in his own defense on one charge but not on another. *State v. Ludwick*, 197 W.Va. 70, 73, 475

24

S.E.2d 70, 73 (1996) citing C. A. Wright, Federal Practice and Procedure: Criminal 2d § 222 (1982).

The State had argued that sexual abuse was the motivation for Petitioner attempting to buy the children. But that argument is deeply flawed by the fact that: (1) there was no evidence of Petitioner's sexual abuse of the alleged victims in the purchasing incident despite Petitioner's substantial exposure to the children, (2) that the alleged sexual abuse of the other child occurred after, not before, Petitioner's alleged attempt to purchase the children, and (3) even the 404(b) evidence from C.R. about Mr. J ''s alleged abuse of that child occurred after the alleged attempt to purchase the child. (Ex. 13 at 183, 189-190).

In applying the above-cited precedent, an analysis of the permissibility of joinder must be considered first. As described above, the offenses are not of the same or similar character. Mr. J 's alleged attempt to purchase the two children is significantly different from his alleged sexual contact with A.P. Further, the only link ever provided to the crimes was the prosecutor's bare assertion that he was trying to buy the children for illicit purposes. However, this argument is without any evidentiary support and is strongly contradicted by the substantial amount of contact the Petitioner had with the alleged victims of the "purchase" with absolutely no claims of any attempt to molest them. Thus, there was simply no evidence of a common scheme because there was no evidence that Petitioner had molested A.A. or K.J. Further, there was no evidence that Petitioner's alleged molestation of A.P. had been accomplished through a common scheme of trying to "purchase" the child or obtain custody through payment.

25

Even if this Court believes that joinder was appropriate, severance should have been granted due to the substantial prejudice that joinder inflicted upon Petitioner. Here, the prosecutor attempted to bolster her "purchase" case through the speculation that Petitioner's motive for doing so was to abuse the children. The State's argument is based purely on speculation without a single piece of corroborating evidence. Clearly, the State was attempting to get the jury to "cumulate the evidence" or convince the jury because Petitioner was a "bad man" his actions in the "purchase" case were with evil intent. Trial counsel's failure to sever the charges played right into the State's speculation. A reasonable attorney would never try these two cases together and the trial court's repeated concerns about the failure to seek severance were well-founded.

## 2. TRIAL COUNSEL WAS INEFFECTIVE WITH REGARD TO VOIR DIRE.

In this case, trial counsel was ineffective with regard to voir dire. Counsel allowed witnesses (sic) who expressed skepticism over the uncorroborated testimony of a child alleging sexual abuse to be stricken without attempting to rehabilitate them. Overall, 3 witnesses (sic) were dismissed for this reason and none of them were asked if the judge instructed them that a child's testimony could be sufficient to justify a verdict would they abide by that instruction. As a result, every juror skeptical of uncorroborated claims of sexual abuse was precluded from the jury despite the fact that there was no absolute need to do so. Because of that, the Petitioner's jury was anything but an impartial jury, but was rather a jury predisposed to believe a child victim's claim of sexual abuse.

26

Not only did counsel's failures in this regard constitute ineffective assistance, but the improper composition of the jury violated Petitioner's federal and state rights to due process.

## 3. TRIAL COUNSEL WAS INEFFECTIVE IN ADDRESSING THE TESTIMONY OF PHYLISS HASTY.

a. Trial Counsel was ineffective in dealing with factual discrepancies.

Trial counsel failed to point out the substantial discrepancy between the actual court testimony of CR that Petitioner never actually sexually touched her (other than kissing her and touching her on her thigh) and the testimony of Phyllis Hasty that CR had reported that Petitioner touched her over her clothes between her legs. (Ex. 13 at 183-186; Ex. 14 at 26-27). Counsel's missed opportunity is reinforced by the fact that the prosecutor relied on the sexual contact with C.R. in her opening statement. (Ex. 13 at 81-82).

b. Trial counsel was ineffective in dealing with repeated offering of impermissible opinion evidence by Ms. Hasty.

At trial, Ms. Hasty, who was supposed to be testifying about her treatment of C.R. and A.P., instead offered substantial amounts of impermissible opinion evidence. This evidence invaded the province of the jury. First, Ms. Hasty opined that only 2-6% of children lie about sexual abuse. (Ex. 14 at 10-11). Second, Ms. Hasty provided additional opinion evidence to explain why children cannot testify as to the specific dates of sexual abuse. (Ex. 14 at 18). This testimony was relied upon by the State in closing. (Ex. 14 at 151). Finally, Ms.Hasty opined that only about 10% of

27

children are coached to improperly report sexual abuse. (Ex. 14 at 40). Again, this improper testimony was relied upon by the State in closing. (Ex. 14 at 154).

The above-cited testimony is improper for a number of reasons: (1) it violates West Virginia Supreme Court precedent regarding the limits of testimony from play therapy, (2) it is improper expert opinion because Ms. Hasty was never disclosed as an expert or qualified to provide expert testimony by the court; and (3) if considered lay opinion evidence it is improper pursuant to West Virginia precedent.

*State v. Pettrey* limited the permissible play therapy testimony to:

> when a social worker, counselor, or psychologist is trained in play therapy and thereafter treats a child abuse victim with play therapy, the therapist's testimony is admissible at trial under the medical diagnosis or treatment exception to the hearsay rule, West Virginia Rule of Evidence 803(4), if the declarant's motive in making the statement is consistent with the purposes of promoting treatment and the content of the statement is reasonably relied upon by the therapist for treatment. The testimony is inadmissible if the evidence was gathered strictly for investigative or forensic purposes. Moreover, statements which attribute fault to a member of the victim's household may reasonably be pertinent to treatment and are thus admissible because these statements are relevant to prevention of recurrence of injury.

*State v. Pettrey*, 209 W.Va. 449, 460, 549 S.E.2d 323, 333 (2001). The exception does not allow opinion evidence.

Because Ms. Hasty was not qualified as an expert witness, the opinion evidence she offered would be in the form of "lay opinion." In order for a lay witness to give opinion testimony pursuant to Rule 701 of the West Virginia Rules of Evidence (1) the witness must have personal knowledge or perception of the facts from which the opinion is to be derived; (2) there must be a rational connection between the opinion and the facts upon which it is based; and (3) the opinion must be helpful in

28

understanding the testimony or determining a fact in issue. Syl. pt. 2, *State v. Nichols*, 208 W.Va. 432, 542 S.E.2d 310 (1999), modified on other grounds by *State v. McCraine*, 214 W.Va. 188, 588 S.E.2d 177 (2003).

In the case at bar, none of the three criteria can be met. Ms. Hasty's opinions did not concern this case, but were broad pronouncements concerning sexual abuse cases in general. Thus, her opinions were not based on her personal knowledge or perception of the facts from which the opinion is to be derived. Second, there was not a rational connection between the opinion and the facts upon which it is based because the opinions were as to the general nature of child sexual abuse cases not opinions derived from the facts of Petitioner's case. Finally, the opinion was not helpful in understanding the testimony or determining a fact in issue because it misled the jury to believe that the discrepancies in this case were "normal" or "usual" without fully comparing the facts of this case, to the other cases upon which her opinions were based. The opinions invaded the province of the jury and provided a rationale for the deficiencies and discrepancies in the children's testimony and should have been precluded as inadmissible lay testimony or as having a prejudicial effect that far outweighed the probative value pursuant to W.Va.R.Evid. 403.

Trial counsels' failure to object to some of these opinions, and failure to seek curative instructions both at the time they were given and at the conclusion of the case coupled with counsel's failure to seek a mistrial constituted ineffective assistance of counsel that prejudiced Petitioner by bolstering the children's testimony impermissibly.

29

c.     Trial counsel was ineffective in failing to secure an expert to discuss the limitations of play therapy.

d.     Trial counsel was ineffective in failing to secure an expert to discuss the limitations of child testimony concerning sexual abuse.

Expert testimony concerning the limitations of play therapy is regularly offered to help a jury understand the limitations and risks of relying on information provided to therapists and child testimony. E.g. *State v. Pettrey*, 209 W.Va. 449, 455, 549 S.E.2d 323, 329 (2001). In addition, expert testimony can help a jury understand the limitations of child testimony in sexual abuse cases. Here, trial counsel did not hire an expert witness as to either subject. In fact, the only "expert" opinion was the impermissible testimony of the state's witness, Phyliss Hasty.

## 4. TRIAL COUNSEL WAS INEFFECTIVE WITH REGARD TO DEFENDANT'S EXHIBITS 1 AND 2.

At trial, counsel promised the jury he would offer and then unsuccessfully tried to admit into evidence a document wherein Sylvia J      , the mother of A.A. and K.J., had signed custody to Petitioner. (Ex. 13 at 86, 147-150). In addition, counsel offered a document wherein Sylvia J     . had granted visitation. (Ex. 13 at 149-150). At trial, Ms. J     denied signing either document. (Id.). Counsel offered no evidence to confirm the signatures even though he had at least two ways to do so even with Ms. J     's denials: (1) by retaining an expert in handwriting analysis; and (2) by offering testimony from persons familiar with her signature. Although, Ex. 2 was admitted through testimony of Petitioner's wife, trial counsel was ineffective in failing to offer testimony from a witness not so easily disregarded by the jury for bias. (Ex. 14 at 66-68). Trial counsel's failed promise to the jury represents ineffective

30

assistance because he could so easily have kept his promise to the jury and strengthened his defense through either of the methods described above.

### 5. TRIAL COUNSEL WAS INEFFECTIVE IN PERMITTING IRRELEVANT OR OTHER INADMISSIBLE EVIDENCE.

At trial, trial counsel permitted substantial amounts of irrelevant evidence to be offered by the State. That evidence consists of:

- Testimony concerning a CPS investigation initiated by Petitioner. (Ex. 13 at 117-129).

During the State's case in chief, the testimony of CPS worker Christopher Bell was offered. His testimony of the investigation of the CPS complaint made by Mr. J       was wholly irrelevant and exceptionally likely to mislead the jury, as the fact that the complaint was determined to be unfounded was revealed to the jury. Trial counsel should have sought exclusion of this evidence under West Va. R. Evid. 401 and 403 but, inexplicably, failed to do so.

- Testimony concerning that mandatory reporting of child abuse was not required for the CPS investigation initiated by Petitioner because no abuse was discovered. (Ex. 13 at 165).

Adding to the irrelevant testimony about the CPS investigation, the State sought an even more prejudicial statement from Corporal Long of the West Virginia State Police that he was a mandatory abuse and neglect reporter and made no report of abuse or neglect of the children. Once again, trial counsel should have sought exclusion of this evidence under West Va. R. Evid. 401 and 403 but, inexplicably, failed to do so.

31

- The testimony of Trooper Long that the Petitioner had committed a crime. (Ex. 13 at 170).

Trooper Long also invaded the province of the jury by opining that Petitioner had violated the law in attempting to purchase the children. Once again, trial counsel should have sought exclusion of this evidence under West Va. R. Evid. 401 and 403 but, inexplicably, failed to do so.

- References to offenses that allegedly occurred in Tennessee without the proper *McGinnis* analysis. (Ex. 13 at 200, 14 at 19).

A.P. testified that Petitioner touched her breasts mostly in the house in Tennessee. In addition Phyliss Hasty testified that sexual abuse of A.P. occurred in Tennessee. This other act evidence should have never been admitted to the trial.

This Court has provided substantial guidance on the admittance of "other act" evidence. Other bad act evidence is governed by W.Va.R.Evid. 404(b) unless the evidence is "intrinsic." As the Court has stated:

> In determining whether the admissibility of evidence of "other bad acts" is governed by Rule 404(b), we first must determine if the evidence is "intrinsic" or "extrinsic." See *United States v. Williams*, 900 F.2d 823, 825 (5th Cir.1990): "'Other act' evidence is 'intrinsic' when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged." (Citations omitted). If the proffer fits into the "intrinsic" category, evidence of other crimes should not be suppressed when those facts come in as res gestae—as part and parcel of the proof charged in the indictment. See *United States v. Masters*, 622 F.2d 83, 86 (4th Cir.1980) (stating evidence is admissible when it provides the context of the crime, "is necessary to a 'full presentation' of the case, or is . . . appropriate in order 'to complete the story of the crime on

32

trial by proving its immediate context or the "res gestae'''").
(Citations omitted).

*State v. LaRock*, 196 W. Va. 294, 312 n.29, 470 S.E.2d 613, 631 n.29 (1996).

If not "intrinsic" in nature, the trial court must continue with a R. 404(b) analysis.

According to the Court,

> [w]here an offer of evidence is made under Rule 404(b) of
> the West Virginia Rules of Evidence, the trial court,
> pursuant to Rule 104(a) of the West Virginia Rules of
> Evidence, is to determine its admissibility. Before
> admitting the evidence, the trial court should conduct an in
> camera hearing as stated in *State v. Dolin*, 176 W.Va. 688,
> 347 S.E.2d 208 (1986). After hearing the evidence and
> arguments of counsel, the trial court must be satisfied by a
> preponderance of the evidence that the acts or conduct
> occurred and that the defendant committed the acts. If the
> trial court does not find by a preponderance of the evidence
> that the acts or conduct was committed or that the
> defendant was the actor, the evidence should be excluded
> under Rule 404(b). If a sufficient showing has been made,
> the trial court must then determine the relevancy of the
> evidence under Rules 401 and 402 of the West Virginia
> Rules of Evidence and conduct the balancing required
> under Rule 403 of the West Virginia Rules of Evidence. If
> the trial court is then satisfied that the Rule 404(b) evidence
> is admissible, it should instruct the jury on the limited
> purpose for which such evidence has been admitted. A
> limiting instruction should be given at the time the
> evidence is offered, and we recommend that it be repeated
> in the trial court's general charge to the jury at the
> conclusion of the evidence.

Syl. Pt. 2, *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994).

Here the mandatory analysis in *McGinnis* was never requested or conducted. The

evidence was likely to mislead the jury and should have been excluded based on the

balancing required by either the *McGinnis* precedent or R. 403. Counsel's failure to

keep this evidence out constitutes ineffective assistance because this evidence further

impermissibly bolstered the State's case.

33

- References to violations of divorce visitation orders by the Petitioner without the proper *McGinnis* analysis. (Ex. 14 at 113-114).

Similarly, the prosecutor referenced Petitioner violating a court order regarding visitation, again without objection by trial counsel or any of the required analysis.

- Opinion evidence by the investigating trooper (Clemons) as to the lack of physical evidence of abuse. (Ex. 13 at 226-228). This improper evidence was relied upon by the State in closing argument. (Ex. 14 at 175).

Trooper Clemons, without proper qualification as an expert, provided an explanation of why there would be no forensic evidence in the case. Once again, this evidence was offered without proper foundation.

- Improper evidence by investigating trooper providing the substance of inadmissible forensic interviews. (Ex. 13 at 221-225).

The investigating trooper provided the substance of inadmissible forensic interview during the State's case in chief. The substance of forensic interviews is absolutely inadmissible in these circumstances per *Pettrey*. Counsel's failure to keep this evidence out constitutes ineffective assistance because this evidence further impermissibly bolstered the State's case.

## 6. TRIAL COUNSEL WAS INEFFECTIVE WITH REGARD TO PRETRIAL PUBLICITY.

Despite substantial pretrial publicity counsel did not explore a change of venue. (Ex. 7).

## 7. TRIAL COUNSEL CONDUCTED AN INADEQUATE INVESTIGATION.

34

Trial counsel failed to call Petitioner's nieces R. M. and T. M. who grew up around Petitioner and could rebut the State's claims of Petitioner's alleged lustful disposition towards children.

## 8. TRIAL COUNSEL WAS INEFFECTIVE IN NEEDLESSLY AND PREJUDICIALLY REFERENCING THE PREVIOUS TRIAL.

Trial counsel inexplicably referenced the previous trial in this matter in front of the jury. (Ex. 13 at 24-25). The jury could only draw one conclusion by the fact that Petitioner was having a second trial, that he had not won the first one. Counsel's failure to keep this evidence out constitutes ineffective assistance because this evidence further impermissibly bolstered the State's case and likely misleads the jury even with the Court's instruction to ignore the remark.

## 9. TRIAL COUNSEL NEEDLESSLY OPENED THE DOOR TO RECITATION OF THE OTHERWISE INADMISSIBLE FORENSIC INTERVIEW OF A.P.

At trial, counsel questioned Petitioner in such a manner that the door was opened to the forensic interview of the A.P. that would otherwise be inadmissible. (Ex. 14 at 98-108). In addition, trial counsel did not object to the introduction of information beyond that required by the curative admissibility rule. Here, trial counsel opened the door to the implication that A.P. was promised to be paid for making her accusation, but vast amounts of the forensic interview were read to the jury. R.106 of the West Virginia Rules of Evidence and the "curative admissibility" rule are limited to admission of that evidence necessary to correct the misstatement . Further, in *State v. Guthrie*, the West Virginia Supreme Court confirmed that any admission under the

35

"curative admissibility rule" was subject to R. 403 balancing analysis. *State v. Guthrie*, 194 W. Va. 657, 682, 461 S.E.2d 163, 188 (1995). There, the Court found that the R. 403 analysis precluded admissibility. Id. at 682-683, 188-189.

Here, the evidence admitted should have been limited to the money issue and the rest of the forensic interview should have never been admitted because it was beyond the scope of permissible response evidence and should be excluded under R. 403 balancing. Inexplicably, trial counsel made no such argument and the evidence came in uncontested.

## 10. TRIAL COUNSEL WAS INEFFECTIVE WITH REGARD TO IMPROPER COMMENTS BY THE PROSECUTOR.

Petitioner asserts that trial counsel was ineffective with regard to improper comments by the prosecuting attorney. The prosecutor improperly and prejudicially asserted that the Petitioner was trying to buy his way out of the charges despite the lack of any evidence to that effect. (Ex. 14 at 178). In addition, the prosecutor improperly implied that Petitioner had been malingering with regard to a foot injury requiring him to use a wheelchair at earlier proceedings. (Ex. 14 at 115). Both of these comments were impermissible and in violation of a prosecutor's obligations. The West Virginia Supreme Court has repeatedly warned prosecutors to "exercise self-restraint regarding remarks not based on evidence which are calculated to prejudice the defendant in the jury's eye." E.g., *State v. Kennedy*, 162 W.Va. 244, 249, 249 S.E.2d 188 (1978). While a prosecutor can prosecute vigorously, "as long as he deals fairly with the accused...he should not become a partisan intent only on conviction." *State v. Hamrick*, 216 W.Va. 477, 481, 607 S.E.2d 806, 810 (2004). Here the comments exceeded the bounds of permissible argument.

36

**b. The State's Response**

That the State agrees with the legal standard set forth in said Petition, but denies that any claim of Petitioner is meritorious or otherwise entitles him to relief. With reference to the Amended Petition the State would argue:

The State disputes the Petitioner's contention that his trial counsel was ineffective. Under the standard set forth in *Strickland v. Washington*, 466 US 668 (1984), counsel's performance was deficient under an objective standard and there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceedings would have been different. The Petitioner states that his trial counsel was ineffective because he failed to seek severance of the charges. However, the State argues that there is no reasonable probability that there would have been a different outcome if the counts had been tried separately. The State contends that there were sufficient evidence to convict the Petitioner of all counts as shown by the verdict.

The Petitioner argues that trial counsel was ineffective with regard to Voir Dire because trial counsel failed to rehabilitate two potential jurors who expressed skepticism over the uncorroborated testimony of a child alleging sexual abuse. However, the State disagrees with the Petitioners contention. There is nothing in the record to indicate that the two individuals in question could have sufficiently rehabilitated to be allowed to remain on the jury. Additionally, there is nothing in the record to show that the verdict would have been different if they had been allowed to remain.

The Petitioner contends that trial counsel was ineffective in addressing the testimony of Phyllis Hasty. However, the State disagrees with Petitioner's contentions. The State argues that the West Virginia Supreme Court adequately dealt with the issue of Phyllis Hasty's testimony. The Court ruled that her testimony was admissible. The Court further noted that the Trial Court gave a limiting instruction with regard to her opinion testimony. Therefore, the State argues that this issue was sufficiently addressed on appeal.

The Petitioner further contends that trial counsel was ineffective with regards to the admission of Defendant's Exhibits 1 and 2. However, the State disagrees. Whereas trial counsel was unable to get Exhibit 1 admitted into evidence, he was still able to get the evidence to the jury though (sic) the testimony of the witness. Trial counsel was able to get Exhibit 2 admitted into evidence. Therefore, the State contends that trial counsel was effective in getting the evidence to the jury. The State further argues that there is nothing in the record to show that the eventual outcome of the trial would have been different if trial counsel had gotten the evidence admitted in a manner described by the Petitioner.

The Petitioner also contends that his trial counsel was ineffective because he did not explore a change of venue. The State argues that there is nothing within the record that shows that pre-trial publicity had tainted the jury pool. In fact, it appears that the parties were able to pick a fair and impartial jury in both trials. Therefore, the State argues that a change of venue motion would not have been granted even if raised and that it had no impact upon the eventual outcome of the case.

38

The Petitioner contends that trial counsel was ineffective with regard to improper comments by the Prosecutor. However, the State disagrees. The State contends that this issue was discussed by the Supreme Court in Footnote 4 of the Decision Brief wherein the Court found that the Petitioner failed to show that the remarks were so damaging that it required reversal. Therefore, the State argues that the issue was sufficiently addressed on appeal.

With regard to any and all additional grounds raised by the Petitioner of Ineffective Assistance of Counsel, the State argues that none of the instances raised, when viewed individually or collectively, would have changed the eventual outcome of the trial. The State argues that the evidence was sufficient to support a guilty verdict.

c. **Findings of Fact and Conclusions of Law:**[5]

The Court makes the following specific finding of fact and conclusions of law regarding the Petitioner's claim of Ineffective Assistance of Counsel:

(1) The Court **FINDS** that the West Virginia Supreme Court of Appeals stated the test to be applied in determining whether counsel was effective in *State v. Miller*:

> In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 764 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have

---

[5] The issue of whether the Petitioner is entitled to relief based on prejudicial pretrial publicity is addressed in III.c.4, *infra*.

39

been different. *State v. Miller,* 194 W.Va. 3, 459
S.E.2d 114 (1995), syl. pt. 5.

(2) The Court **FINDS** that the West Virginia Supreme Court of Appeals has also

held that:

> Where counsel's performance attacked as
> ineffective arises from occurrence involving
> strategy, tactics, and arguable courses of action, his
> conduct will be deemed effectively assistive of his
> client's interests, unless no reasonably qualified
> defense attorney would have so acted in the defense
> of the accused. *State ex rel Humphries v. McBride,*
> 220 W.Va. 362, 645 S.E.2d 798 (2007) syl. pt. 5. In
> accord, Syllabus point 21, *State v. Thomas,* 157
> W.Va. 640, 203 S.E.2d 445 (1974).

(3) The Court **FINDS** that the West Virginia Supreme Court of Appeals has also

held that:

> [i]n reviewing counsel's performance, courts must
> apply an objective standard and determine whether,
> in light of all the circumstance, the identified acts or
> omissions were outside the broad range of
> professionally competent assistance while at the
> same time refraining from engaging in hindsight or
> second-guessing of trial counsel's strategic
> decisions. Thus, a reviewing court asks whether a
> reasonable lawyer would have acted, under the
> circumstances, as defense counsel acted in the case
> at issue. *State v. Miller,* 194 W.Va. 3, 459 S.E.2d
> 114 (1995) syl. pt. 6.

(4) The Court **FINDS** that the West Virginia Supreme Court of

Appeals has stated on the issue of whether a severance should

be granted that:

> A defendant is not entitled to relief from prejudicial
> joinder pursuant to Rule 14 of the West Virginia
> Rules of Criminal Procedure when evidence of each
> of the crimes charged would be admissible in a
> separate trial for the other.

40

*State v. Millburn*, 204 W. Va. 203, 511 S.E.2d 828, syl. p. 2.

(5) The Court **FINDS** that the West Virginia Supreme Court of

Appeals has held that:

> "The right to a trial by an impartial, objective jury in a criminal case is a fundamental right guaranteed by the Sixth and Fourteenth Amendment of the United States Constitution and Article III, Section 14 of the West Virginia Constitution. A meaningful and effective *voir dire* of the jury panel is necessary to effectuate that fundamental right." Syllabus Point 4, *State v. Peacher*, 167 W.Va. 540, 280 S.E.2d 559 (1981).

> and

> "In a criminal case, the inquiry made of a jury on its *voir dire* is within the sound discretion of the trial court and not subject to review, except when the discretion is clearly abused.' Syl. pt. 2 *State v. Beacraft*, 126 W.Va. 895, 30 S.E.2d 541 (1944)." Syllabus Point 2, *State v. Mayle*, 178 W.Va. 26, 357 S.E.2d 219 (1987).
> *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (W.Va. 1994), syl. pt. 415

(6) The Court **FINDS** that in determining whether or not to apply

West Virginia Rules of Evidence 404(b) to the admissibility of

evidence, the Court must decide whether the proffered evidence

is intrinsic or extrinsic to the action:

> In determining whether the admissibility of evidence of "other bad acts" is governed by Rule 404(b), we first must determine if the evidence is "intrinsic" or "extrinsic." *See United States v. Williams*, 900 F.2d 823, 825 (5th Cir.1990): "'Other act' evidence is 'intrinsic' when the evidence of the other act and the evidence of the crime charged are 'inextricably interwined' or both acts are part of a 'single criminal episode' or the other acts were

41

'necessary preliminaries' to the crime charged."
(Citations omitted). If the proffer fits in to the
"intrinsic" category, evidence of other crimes
should not be suppressed when those facts come in
as *res gestae* – as part and parcel of the proof
charged in the indictment. *See United States v.
Masters*, 622 F.2d 83, 86 (4th Cir.1980) (stating
evidence is admissible when it provides the context
of the crime, "is necessary to a 'full presentation' of
the case, or is . . . appropriate in order 'to complete
the story of the crime on trial by proving its
immediate context or the "res gestae"''"). (Citations
omitted). It seems doubtful this case could have
been presented appropriately without showing when
and how the young victim received the injuries that
appeared on his body. Evidence the defendant was
responsible for all the injuries to the victim would
seem to " 'complete the story of the crime.'"
*Masters*, 622 F.2d at 86. (Citation omitted).
Indeed, evidence admissible for one of the purposes
specified in Rule 404(b) and *res gestae* not always
is separated by a bright line. *See United States v.
Cook*, 745 F.2d 1311, 1317-18 (10th Cir.1984), *cert.
denied*, 469 U.S. 1220, 105 S.Ct. 1205, 84 L.Ed.2d
347 (1985).
*State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613
(W.Va. 1996), fn. 29.

(7) The Court **FINDS** that at the trial, C. R. was called as

a 404(b) witness and testified as follows:

**BY MS. WILLIAMSON:**

Q       Please state your name.

A       C. R.

Q       How old are you?

A       Twelve.

Q       What's your date of birth?

A       September 16th, 1999.

42

Q    Where do you live?

A    Spanishburg.

Q    With whom do you live?

A    My mom, my dad and my sister.

Q    What's your mom's name?

A    April J

Q    What's your dad's name?

A    Kevin J

Q    What's your sister's name?

A    A.    P.

Q    That wasn't too hard, was it?

A    (Shakes head)

Q    How is your father, Kevin J        ; related to Mark
J    .

A    He's his dad.

Q    So is Mark your grandfather?

A    (Nods head)

Q    Is that yes?  You have to answer out loud.

A    Yes.

Q    I'm going to ask you questions about what
happened three or four years ago when you were about eight or
nine.

43

Did your grandfather, Mark J.        , ever do anything to
you that you did not like?

A      Yes.

Q      Tell us what.

A      Tried to kiss me.

Q      How?

A      With his tongue.

Q      Do you know where you were when this happened?

A      My house.

Q      Is that your house in Spanishburg?

A      Yes, ma'am.

Q      Describe it.

A      Like, he just - -

Q      Where were you? If you can remember, where
were you?

A      I was in the living room.

Q      And where was he?

A      At my house with me.

Q      Was he in the living room?

A      Yeah.

Q      What were you doing?

A      Sitting on the couch.

Q      Was anybody else in the living room?

44

A    No.

Q    And you said he tried to kiss you?

A    Yes.

Q    With his tongue?

A    Yes.

Q    Were you both on the couch?

MR. HOLROYD: I believe she's leading the witness a little bit.

THE COURT: All right. Let's refrain from that. I mean, I'll let you have a little bit of latitude.

**BY MS. WILLIAMSON:**

Q    Do you remember how it felt and tasted?

A    He just tried to do it and I blocked him.

Q    Do what?

A    He just tried to kiss me and I blocked him.

Q    You what now? I'm sorry.

A    Like I didn't let him get near me.

Q    Okay. Did he ever do anything else that you didn't feel comfortable with?

A    No.

Q    Did he ever try to touch you?

A    Yeah.

Q    Where?

45

A     Like my breast.

Q     Did he actually touch your breast?

A     No, but he tried.

Q     How did he try?

A     Like, he would like go near me and I'd just like back up.

Q     Did (sic) ever touch you anywhere else on your body that made you feel uncomfortable?

A     No.

Q     Did he ever touch your legs?

A     Yes.

Q     Where?

A     Like my thigh.

Q     What part of your thigh?

A     Like near my private.

Q     What happened when he tried to do that?

A     I walked off.

Q     Where was this?

A     At my house.

Q     Did he ever actually touch your privates?

A     No.

Q     Did he ever actually touch your breasts?

A     No.

46

Q     Did you ever tell anybody - -

A     Yes.

Q     - - about what he had done that you just told us about?

A     Yes.

Q     Who?

A     My mom.

Q     When?

A     The day that it happened.

Q     The day what happened?

A     He did that. When they were getting ready to go out for their anniversary.

Q     What was the circumstances of your telling?

A     Because my mom and them was going off for vacation for their anniversary and he had to watch us.

Q     And why did you tell then?

A     Because I didn't want him to do it anymore. It wasn't comfortable.

Q     Did anyone ever tell you to make up these allegations, these thing (sic) that you've just told us ?

A     No.

Q     Is what you're saying true?

A     Yes.

47

Q      Did you ever see any counselors as a result of what your grandfather did?

A      Yeah.

Q      Who?

A      I don't remember her name.

Q      Would you recognize it if I said it?

A      Probably.

Q      Was it Phyllis Hasty?

A      Yeah.

Q      Do you know how many times you went to see Ms. Hasty?

A      About four times.

Q      Do you know why you stopped going there?

A      No.

Q      Did you like going to see Ms. Hasty?

A      Yes.

Q      Did you ever see your grandfather do anything that you thought was improper toward your sister, A     P     ?

A      Yeah.

Q      What?

A      Try to touch her where you shouldn't touch people.

Q      Where was this?

A      At my house.

48

Q    What did you see your grandfather do to your sister?

A    Kiss her.

Q    How?

A    Like - - just like on the lips.

MS. WILLIAMSON:  Thank You.

Your witness.

THE COURT:  All right.  Mr. Holroyd.

## CROSS-EXAMINATION

**BY MR. HOLROYD:**

Q    Young lady, do you recall what year these events that you've just testified took place?

A    In 2008.

Q    Sometime during 2008?

A    Yeah.

Q    Can you give us a month?

A    No.

Q    Can you give us a day of the week?

A    No.

Q    Was it in the morning?  Noon?  Night?  Or the evening?  When was it?

A    Evening.

Q    Evening?

49

A    Yeah.

Q    But you don't - - you know it was sometime in 2008.

A    Yeah.

Q    And you're fairly sure of that?

A    Yeah.

Q    But you can't tell us whether it was January or December.

A    No.

Q    Have you talked to anybody about that since you and I discussed this before?

A    No.

Q    You didn't say anything to anybody about it?

A    About this?

Q    About what you're talking about.

A    No.

Q    About whether or not you could remember the year that it was. Because you remember testifying before, don't you?

A    Yeah.

Q    And you testified at that time, I asked you the question, "What year was it that it happened? Do you know?" Answer, "No."

50

Do you recall that, those questions being asked you?

A       Yeah.

Q       And that answer being given?

A       Yeah.

Q       So what makes you now testify that it was sometime in 2008?

A       Because I was like eight years old when I turned eight it was like 2008.

Q       And you haven't talked to anybody about it? You figured that out by yourself?

A       Yeah.

MR. HOLROYD: That's all the questions I have.

THE COURT: Any other questions at all?

MS. WILLIAMSON: No, sir.

THE COURT: Can she be excused then?

MS. WILLIAMSON: Yes.

THE COURT: All right. Thank you.

(Witness excused)

(*See* Trial Transcript of November 1, 2011, at p. 182, L:6 thru p. 192, L:7)

(8) The Court **FINDS** that at the trial, A     P     , the victim in Counts 3 through 10 of the indictment, testified as follows:

Q      Please state your name.

A      A    _P      (sic).

Q      I'm going to ask you to speak up as loudly as you can, okay.

A    , how old are you?

A      Thirteen.

Q      What's your date of birth?

A      

Q      Where do you live?

A      Spanishburg.

Q      What county is that?

A      Mercer.

Q      How do you know the Defendant, Mark Lynn J    ?

A      He's my grandfather.

Q      What do you call him?

A      Mark.

Q      I'm going to ask you some questions about what happened between March, 2007 and February, 2008.  Do you know how old you were at that time?

A      No, not right off the bat.

Q      Okay. It's kind of hard to do math when you're in the courtroom, isn't it?

A      (Nods head)

Q      During that time between March 2007 and January 2008, did the Defendant, Mark J     , , do anything to you that made you feel bad?

A      Yes.

Q      What?

A      He would touch me.

Q      Where would he touch you?

A      My vagina and my breast.

Q      When he touched your vagina, where were you?

A      We would either be in his car, his brother's, or sometimes at my house.

Q      When it was in his car, can you describe what happened.

A      He would have me sit in the passenger sat (sic), he would make me unbutton my pants and he would just touch me.

Q      Was he - - were you - - was he driving? Or were you parked? How would that happen?

A      He would either be driving or he would be parked.

Q      Do you recall an instance where he was parked and he touched your vagina?

53

A    Yes.

Q    Where?

A    We could be in behind Walmart, we would be in different places.

Q    When it was behind - - a different place, - - well, let's just take Walmart. Which Walmart?

A    Princeton

Q    And who would be with you?

A    Just me and him.

Q    And why were you at Walmart?

A    We would just go places just to get away from everybody.

Q    And you said he would make you unbutton your pants?

A    Yes.

Q    Do you recall any specific instance when that happened?

A    No.

Q    You said you were seated in the passenger's seat?

A    Yes.

Q    Is that front or back?

A    Front.

54

Q       And what would he do when - - how would you unbutton - - when you unbuttoned your pants, what would he do?

A       He would have me just lay down.

Q       Did you have to put the seat back down? Or was it already down?

A       Sometimes he would have me lay it back.

Q       And once you laid back, what would he do?

A       He would put his hand down my pants.

Q       Did you have panties on?

A       Yes.

Q       Did he go over or under your panties?

A       Under.

Q       What did he do once his hand - - once his hand was down under your panties?

A       He would rub my vagina.

Q       Did he ever insert anything into your vagina?

A       No.

Q       Did he ever penetrate with his finger?

A       What does that mean?

Q       Did he ever put his finger in your vagina?

A       Yes.

Q       Would this be at the Walmart in Princeton?

55

A     It most (sic) happened at his brother's, James, house.

Q     And where was that?

A     It's somewhere around I think McDowell County.

Q     Did he ever do this at your home?

A     Yes. When my parents nor my sister would be there.

Q     Excuse me.

A     When my parents or my sisters wouldn't be there.

Q     Would not be there?

A     (Nods head)

Q     Do you recall anything the Defendant did at your home in Spanishburg while your parents or sister were not there.

A     He would pull down my pants and touch my vagina.

Q     Would he say anything to you during these times when he touched your vagina?

A     No.

Q     Did he tell you anything as to who - - whether or not you should tell anyone?

A     He would say - - he would say he would get in trouble and my parents would probably get a divorce.

Q     You also said that he touched your breasts.

A     Yes.

56

Q      Where was this?

A      That mostly happened at his house in Tennessee.

Q      Did he ever do it in Mercer County?

A      No.

Q      You don't recall that?

A      I don't recall.

Q      Did he ever - - when he touched your breasts, was he over or under your clothes?

A      Sometimes under, sometimes over.

Q      Did he ever say anything to you while he was touching your breasts?

A      "I'm just seeing if they're getting bigger."

Q      When he touched your vagina, how did that make you feel?

A      It made feel upset, scared and worried.

Q      Did he ever try to kiss you inappropriately?

A      Yes.

Q      How?

A      When no one was around he - - when he kissed me he would put his tongue in my mouth.

Q      What did you do, if anything, to stop what he was doing?

A      Nothing.

Q      Why not?

A      Because I was scared.

Q      Prior to the Defendant doing these things to you, do you ever remember a time when - - before this when you liked him?

A      Yes.  When I first met him.

Q      Did you ever do anything that was fund with him before he started touching you like you described?

A      He would just come to our house and play with us.

Q      Did he ever take you on any trips?

A      Yeah.

Q      Do you remember where you would go?

A      Is this before or after?

Q      Before.

A      He would sometimes take us to Walmart and let us pick out things that we wanted to play with.  And he would sometimes go on a walk with us.

Q      Do you ever remember going to Disney World or Animal Kingdom or parks like that?

A      Yeah.  That happened after he started touching me.

Q      Okay.  And who would go with you to these places?

A      When we went to Florida, it was me, my sister, him and my grandma, Kathy.

58

Q      Was Kathy his - - Kathy's the Defendant's wife?

A      Yes.

Q      That would be your grandmother?

A      Yes.

Q      Was she ever around when he touched you like this?

A      She hardly ever come - - she's hardly ever come down with him. Like she would come down for Christmas, special occasions.

Q      So when the Defendant came down to your house, he was usually alone?

A      Yes.

Q      When did he stop touching you like this?

A      When me and my sister told on him.

Q      When did that happen?

A      Me and my dad went to 7-11 and then he was fixing to come down again because it was almost my parents' anniversary and he was supposed to watch us. And when she asked him - - asked her why she didn't like Mark, she told them. And when I - - when me and my dad got back, she called me back in her room and asked me about it.

Q      Is that the first time you told anybody what your grandfather had been doing to you?

59

A    No.

Q    Who did you tell?

A    Mark told C     ..

Q    You and Mark told C     ?

A    Yeah.

Q    What does that mean?

A    We went to Walmart one day and he just told her that he had been touching me.

Q    Mark told C    . that he had been touching you?

A    Yes.

Q    What - - how old was C.    at the time?

A    I don't really know right off the bat.

Q    What's the age difference between the two of you?

A    Nine months.

Q    Has anyone ever told you or suggested that you make up things about your grandfather?

A    No.

Q    Is what you're telling here and what you've told the ladies and gentlemen of the jury the truth?

A    Yes.

Q    Okay. I'm going to ask you a silly question. Have you ever been married?

A    No.

60

Q    Have you ever seen a counselor as a result of what the Defendant did to you?

A    Yes.

Q    Do you remember who?

A    I don't remember their names. But we went to Child Protective Services and after that we went to a play therapist, Phyllis.

Q    A play therapist, Phyllis?

A    Uh-huh.

Q    Would that be Phyllis Hasty?

A    Yes.

Q    How many times did you see Phyllis Hasty?

A    Probably about three times.

Q    Do you know why you quit going?

A    We would hardly talk about stuff. All we would do is play games.

Q    Do you remember telling Phyllis what the Defendant did to you?

A    Yes.

Q    Did you like going there?

A    It was all right but I really didn't care for it.

Q    Why not?

61

A       We just didn't discuss the problem that much. All we would do is just play board games.

Q       Do you recall what you told Phyllis that your grandfather did?

A       I don't remember all of it, but when she asked where he had been touching me, she had a doll and I would have to point to the parts on the doll. That's all I remember.

Q       Did you discuss the feelings you were having with Phyllis?

A       Yes.

Q       What kind of feelings were you having?

A       I was upset. Partially angry.

Q       Have you ever talked to your grandfather after you told your parents what he did to you?

A       No.

Q       Why not?

A       Because I haven't want to say anything to him.

MS. WILLIAMSON: Thank you.

THE COURT: All right. Mr. Holroyd.

CROSS-EXAMINATION

BY MR. HOLROYD:

62

Q     You've told us things that have happened here now. Let me ask you if you can tell us what dates any of these things happened.

A     I can't remember the exact dates.

Q     Can you remember the years in which the things happened?

A     No. But it started in third grade and ended in fourth.

Q     But you don't know whether - - what - - you can't tell us what year it was or what months during the year it was?

A     No.

Q     Or what day of the week it was?

A     No.

Q     You don't know any of those things. Right?

A     No.

MR. HOLROYD: That's all.

THE COURT: All right. Any other questions at all?

MS. WILLIAMSON: No.

THE COURT: Can she be excused?

MS. WILLIAMSON: Yes.

THE COURT: All right. Thank you. You're free to go.

63

(Witness excused)

(*See* Trial Transcript of November 1, 2011, at p. 194, L:15 thru p. 208, L:11)

(9) The Court **FINDS** that at the trial Kevin J testified as follows:

**BY MS. WILLIAMSON**

Q       Please state your name.

A       Kevin J.

Q       Mr. J    , what's your relationship to A

P    ?

A       She's my step-daughter.

Q       How long have you been living with her?

A       Over ten years.

Q       What's your relationship to C    R    ?

A       She's my step-daughter.

Q       And how long have you been living with C    ?

A       Ten years.

Q       Who are you married to?

A       April P    J    .

Q       Okay. Do you know what date you were married?

A

Q       How are you related to the Defendant, Mark

J    ?

64

A He is my biological father.

Q Would your father come to visit you between March 2007 and February 2008 in your home?

A Yes.

Q Who would he come with?

A Nobody.

Q Why would he come?

A Just to see the kids and me and everybody else.

Q Where would he stay?

A In my living room.

Q Is your father married?

A Yes, he is.

Q To who?

A Kathy J.

A Did Kathy not come with him all the time?

A Not all the time. No.

Q How often did he come without his wife during 2007 and 2008?

A Almost every time. I'm not exactly sure.

Q Did he ever watch or babysit A       or C while you and April were out?

A Yes.

65

Q      Did your father ever ask to take A      to Walmart or places?

A      Yes.

Q      How old was she?

A      Seven, eight years old.

Q      So was he alone with her at that time?

A      Yes.

Q      You gave him care, custody, and control of A.      ?

A      Yes.

Q      Since you found out what the - - what A      told you, have you had any relations with your father?

A      No.

Q      Why not?

A      Because I believe my daughter.

Q      Have you had any relations with your - - do you have any brothers?

A      Yes.

Q      What are their names?

A      Keith J      and Kirby J      .

Q      Does Kirby have any children?

A      Yes.

Q      Who?

66

A    A      and K    J       . And he has Christopher and William and one on the way.

Q    With regard to A      J      , did you have any chance to see your father around December the 12th, 2006?

A    I'm not sure.

Q    Did he ever talk to you about wanting to buy A    ?

A    Yes.

Q    When?

A    I'm not exactly sure about that neither.

Q    Well, tell us what you know about him wanting to buy A.

A    All I know is, he came to my house, he told me he had $20,000 and he was wanting to go try to buy A    ..

Q    Did you see the $20,000?

A    No, I did not.

Q    Who was he with?

A    Nobody.

Q    Why did he want to buy A    ?

A    I have no clue.

Q    Did he give you any reason for him to buy A    ?

A    No.

Q    Did he say she was abused or neglected?

67

A    Well, there's been rumors but no.

Q    Did he have any contracts or mention any lawyers or any proceedings?

A    No, ma'am.

Q    So what's your understanding of what the Defendant was going to do with the $20,000 and A      ?

A    He was just going to go buy her and take her home.

Q    Take her home where?

A    To Tennessee.

Q    What about A      's sister, K      . Was he going to take her?

A    No, not that I know of.

Q    How old was K     ?

A    Two, three.

Q    And A    ?

A    Three or four.

Q    Does A      have any problem that you know of communicating?

A    Yes.  She's a little slow.

MS. WILLIAMSON: That's all.  Your witness.

THE COURT: All right.  Mr. Holroyd.

MR. HOLROYD: I don't have any questions.

68

(*See* Trial Transcript of November 1, 2011, at p. 209, L:2 thru p. 214, L:11)

(10)    The Court **FINDS** that at the trial, Sylvia A        J.

testified as to the allegations contained in Counts 1 and 2 of the indictment:

testified as follows:

## DIRECT EXAMINATION

## BY MS. WILLIAMSON:

Q    Please state your name.

A    Sylvia A

Q    And have you ever gone by another last name?

A    Sylvia J

Q    And how did you become Sylvia J    ?

A    I was married to the Defendant's son, Kirby.

Q    You were married to his son, Kirby?

A    Yes.

Q    Do you have any children?

A    Yes.

Q    What are their names?

A    A    N    A        and K    M

J

69

Q     And what is A       's date of birth?

A

Q     And what's K       's date of birth?

A

Q     And you now currently go by Sylvia

A       ?

A     Yes, ma'am.

Q     Ms. A       , I'm going to direct your attention to December 12th, 2006. Do you recall the Defendant coming to visit you?

A     Yes.

Q     Where were you living at the time?

A     Kegley, West Virginia.

Q     And the Defendant at that time was your father-in-law?

A     Yes.

Q     What was the relationship between you and Kirby, your husband, at the time? Were you married? Living together? Separated? Divorced? What?

A     I can't remember.

Q     Where — where at that time did the Defendant live?

A     Tennessee.

70

Q      So he came from Tennessee apparently to your residence?

A      Yes.

Q      In Kegley?

A      Yes.

Q      What -- whom did he come with?

A      Alone.

Q      Before December 2006, had the Defendant been around your daughters, A      and K      ?

A      Yes.

Q      Had he been around them without your being present?

A      Yes.

Q      What happened on December 12th, 2006? What did the Defendant do in your residence?

A      He showed up with a brief case and asked me to come back to my bedroom, and I went back there. And he opened it and it had a large amount of money it. And he offered me the money for my daughter, A      A'

Q      What do you mean he offered you money for A      ?

A      He said it would help me get my life straight and it would give her a better life.

71

Q      What did he — what did he want?

A      I couldn't tell you. All I know is he just offered me the money.

Q      What was it for? For A       ?

A      Yes. For A       .

Q      Do you remember what he said?

A      He said for A       .

Q      Okay. Did you count the money?

A      No. I never touched it.

Q      Did he say how much money was there?

A      He said it was 15,000 and he had to go to the bank to get the other 5,000.

Q      So he was offering $20,000?

A      Yes, ma'am.

Q      Was anybody around to see this?

A      No.

Q      Who was with you in your residence at the time?

A      It was my mother and my uncle and I think my oldest brother, if I'm not mistaken, and then the two kids.

Q      Did he do this in front of them?

A      No.

72

Q     What happened then?

A     He left and I called my cousin and she

— Dreama Smith, and she told me I needed to call the State

Police. And I got off the phone with her and called the

State Police. And then they told me that when he come

back to call and they would meet me at my residence.

Q     Why was he coming back?

A     Because he had stated that he needed to

go get the rest of the money.

Q     Did you tell him that you'd think about

it?

A     No.

Q     Or that you would take it?

A     No.

Q     Why was he going back for more money?

A     I'm not for sure.

Q     Describe the suit case.

A     It was brown and it had a handle on it.

Q     Did the Defendant offer to have you sign

any documents turning A     over?

A     No.

Q     Did he offer to go to an attorney to do

this?

73

A     No.

Q     He just brought you money for A        ?

A     Yes.

Q     Are you sure it wasn't also for K       ?

A     No.

Q     You're not sure, or you are sure?

A     I'm sure.  He never stated anything about K      .

Q     And how old was A        at the time?

A     She was four.

Q     How old was K      at the time?

A     Two.

Q     Does A       have any special needs?

A     Yes.

Q     What are they?

A     She's been diagnosed with autism, depression, ADHD and there's a few other that I've forgot.

Q     Was she able to communicate as normal four-year-olds at the time?

A     No.

Q     After the Defendant left to go get some more money, what happened?

A     I called my cousin and she told me to

74

call the State Police. And I got the State Police to come down and that's where they arrested him, was at the residence.

Q    At your house?

A    Yes.

Q    When did you call the State Police?

A    As soon as he left. And I had called my cousin and she told me I needed to get off the phone with her and call the State Police.

Q    And then did you call the State Police again?

A    Yes. When he returned.

Q    And when the Defendant returned, what did he say?

A    The State Police were there to arrest him.

Q    Oh. The State Police were there.

A    Yes.

Q    So he was there, the State Police were there and he was there with the briefcase and the money?

A    Yes.

MS. WILLIAMSON: Thank you.

THE COURT: Mr. Holroyd.

**CROSS-EXAMINATION**

75

**BY MR. HOLROYD:**

Q     Your testimony is that there was no evidence or no conversation that he was trying to purchase K ˍ Is that correct?

A     Yes, sir.

Q     You had agreed on a previous occasion for Mr. J ' here, your then father-in-law, to have custody of both children, didn't you?

A     No.

Q     You didn't sign a document doing that?

A     No.

Q     Let me hand you a piece of paper and ask you if you recognize that (hands document to witness)?

A     No, I do not.

Q     There's a couple of signatures —

MS. WILLIAMSON: Your Honor, what number is that?

THE COURT: I don't know.  Show that to her.

MS. WILLIAMSON: May we approach?

THE COURT: Yeah.  Come on up.

(WHEREUPON the following discussion was had at the bench, out of the hearing of the jury)

MS. WILLIAMSON: This has not been marked for this trial.

THE COURT: I'm sorry. Do what?

MS. WILLIAMSON: This has not been marked for this trial. It was not, I believe, admitted the last time.

THE COURT: She didn't recognize this, though, right? I mean, she didn't recognize this.

MS. WILLIAMSON: That's what she said.

MR. HOLROYD: I haven't asked for it to be admitted.

THE COURT: We can get it marked as Exhibit 1 and see what happens with it.

All right. Go ahead.

(Open court)

**DEFENDANT'S EXHIBIT NO. 1 MARKED**

**FOR IDENTIFICATION**

The document herein referred to was thereupon marked for identification as above-indicated.

**BY MR. HOLROYD:**

Q      Is any of the writing on this document (indicating) in your writing?

A      No.

77

Q    And you say you've never seen that before.

A    No, I have not.

MR. HOLROYD: Your Honor, we'd like to have that — it's already been marked for identification. We'd like to visit that later.

THE COURT: All right. It'll be marked.

BY MR. HOLROYD:

Q    Let me hand you another document (hands document to witness) and ask you if you recognize this.

A    No, I do not.

Q    That says, "I, Sylvia J        , agree to give Mark and Kathy J        visitation rights to A.

A        and K    .J        ." And there's a signature, Sylvia J        , 10-27-06. That's not your signature?

A    No.

MR. HOLROYD: I'd like to have that marked as Defendant's Exhibit No. 2, Judge.

THE COURT: All right. It'll be marked.

**DEFENDANT'S EXHIBIT NO. 2 MARKED FOR**

**IDENTIFICATION**

The document referred to was thereupon marked for identification as above indicated.

78

**BY MR. HOLROYD:**

Q    Now you testified before the Court here that your then father-in-law — well, when was your divorce final?

A    I think it was 2007.

Q    2007?

A    I think it was. I don't remember.

Q    The year after these incidences. Is that correct?

A    Yeah, I think so.

Q    Were you there?

A    Yeah, I was there, but I don't remember what — I think it was —

Q    You don't remember what year it was?

A    I think it was February 15th, 2007.

Q    All right. Have you ever executed a document giving you former father-in-law here any visitation rights or custody rights?

A    No.

Q    Have they ever — have he and his wife ever taken these children anywhere?

A    Yes.

Q    And tell us about that.

A    He took A    to Dollywood and Disney World.

Q    And how long were they gone?

79

A    It think it was like two weeks at the most.

Q    And when was that?  Do you know?

A    I'm not for sure.

Q    Did you ever have any problems with letting him have these times with the children?

A    No, sir.

Q    We've taken some testimony here about where you were exposing yourself on the internet.  Do you recall that incident?

A    Yes.

Q    Tell the jury how that came about.

A    I'm not for sure.

Q    How did that happen.

A    Because I don't even know where the video come from.

Q    Because what?

A    I don't remember — I don't even remember where the video come from.  Like nobody's ever told me about the video until I had a state trooper come to my house one night.

Q    You don't remember exposing yourself on the internet?

A    I do, but don't recall when it was.

80

Q      How often was it?

A      Just that one time.

Q      Just that one time?

A      Yes.

Q      And who were you exposing yourself to?

A      It was my ex-husband, which was Kirby J

Q      And not for some other people?

A      No.

Q      And where — where was your child or your children when this was taking place?

A      She was in the background on the bed.

Q      And was she moving around or what?

A      She was asleep but then she started waking up and that's when I stopped.

Q      Were you and your husband separated at this particular time?

A      Yes.

Q      Had the divorce been filed?

A      I think so, but I think we hadn't went through the divorce court yet.

Q      Well, why were you exposing yourself to him?

A      I don't know.

Q      Were you drinking —

81

A   No.

Q   — or on drugs or anything?

A   No.

MR. HOLROYD: That's all.

THE COURT: All right. Any other questions at all?

## REDIRECT EXAMINATION

**BY MS. WILLIAMSON:**

Q   How old — did your father-in-law take

both K    and A    to Dollywood and Disney World?

A   No.

Q   And who did he take?

A   A    .

Q   And how old was she at the time?

A   I think like four or five.

Q   Since he tried to buy A'    , has he had any contact

with her?

A   No.

Q   And how old was A    at the time he tried to buy

her?

A   She was four.

Q   How far have you gone in school?

A   Eleventh.

Q   Did you ever graduate?

82

A      No.

Q      Get your GED?

A      No.

MS. WILLIAMSON: That's all.

THE COURT: Any other questions at all?

MR. HOLROYD: That's all.

(11)    The Court **FINDS** that Corporal James Long testified as to the matters alleged in Counts 1 and 2 of the indictment, to include the Petitioner's admission of the same:

(Witness sworn)

**CORPORAL JAMES LONG** was thereupon called as a witness by the State and, having been first duly sworn, testified as follows:

## DIRECT EXAMINATION

### BY MS. WILLIAMSON:

Q      State your name.

A      Corporal James Long.

Q      Where do you work?

A      State Police.

Q      How long have you been with the State Police?

A      Fifteen years.

Q      Did you respond as a corporal or a state trooper on the 12th day December, 2006, to a complaint of the

Defendant, Mark J      , trying to purchase a child, a grandchild, A    A    ?

A     Yes, ma'am.

Q     Can you explain what you did in reference to that complaint.

A     If I recall correctly, the initial complaint that I got was his — the Defendant's daughter-in-law actually filed for a domestic violence petition. She called the office and stated he was there, back at her house, and the order had not been filed yet — or served yet.

So when I arrived on scene, I read through the narrative in the domestic violence petition and then also determined at that time that he was trying to buy her kids.

Q     Did you meet with Sylvia? Is that the person who just came to testify? Is that his daughter-in-law?

A     Yes, ma'am.

Q     Okay. And where did you meet up with the Defendant.

A     At her home.

Q     And where's that?

A     It was on — it was in a trailer on Bluestone Road in Mercer County.

Q     Mercer County?

84

A     Yes, ma'am.

Q     Was the Defendant with anybody else?

A     No, ma'am.

Q     Do you know his wife?

A     No, ma'am.

Q     Was there anyone with him?

A     No. He was there alone.

Q     And where does he live?

A     Somewhere in Tennessee.

Q     Did you observe any cash or cashier's check on the Defendant?

A     Both.

Q     What did he tell you?

A     At the time, I actually seized a cashier's check for either 15,000 or $15,500 and some actual U.S. currency. I place him under arrest, transported him to my office, read him his Miranda rights, obtained a written statement. At that time the Defendant stated that he was there and attempted to buy two of his grandchildren from the lady you just spoke of for $20,000.

Q     Are you sure he came to buy both of them?

A     I don't recall. I'd have to look at the statement again to see if he stated he wanted to buy one or both.

85

MS. WILLIAMSON: May I approach, Your Honor.

THE COURT: Sure.

THE WITNESS: In one of the questions —

MR. HOLROYD: Judge, I'd like to know what he's looking at.

MS. WILLIAMSON: That's the Defendant's statement.

MR. HOLROYD: Just a minute.

THE WITNESS: In one of the questions, he was asked —

THE COURT: Just a second. He's looking for it.

THE WITNESS: I'm sorry, sir.

MR. HOLROYD: All right. Thank you.

THE COURT: All right. Go ahead.

THE WITNESS: The first question I asked him in this interview was, "What is your daughter-in-law's name?" He stated, "Sylvia J        ."

The next question was, "Does she have two children?" He answered, "Yes. A      N      A      . and K.      M      J      ."

"Did you travel from Tennessee to Mercer County, West Virginia today?" He stated, "No. I got here last night."

The next question was, "Did you offer Ms. Sylvia J anything for her children?"

"I offered her $20,000 cash for both children."

86

"Did she take the money?"

"No."

"How did you offer her the money?"

"I had it in cash. I had it in a suitcase."

"After Ms. J          refused to take the money, what did you do with it?"

"I put it in a certified check."

"How much was the check?"

"$15,500."

"Why did you offer Ms. Sylvia J          $20,000 for her children?"

His answer was, "Because the children live in sub-standard conditions. They are neglected. I could give them a better life."

The last question I believe I asked, "Have you ever reported that they, the children, were neglected?"

His answer was, "Just she, the mother, was on the internet showing porn pictures of herself while her daughter was watching."

### STATE'S EXHIBIT NO. 2 MARKED FOR IDENTIFICATION

The document referred to was thereupon marked for identification as above indicated.

87

**BY MS. WILLIAMSON:**

Q    So his explanation as to your questions had it ever been reported that the children had been neglected or abuse was just the internet?

A    That's correct.

Q    And I'm going to refer this as — it's been marked as State's Exhibit No. 1 — or excuse me, No. 2, that is the statement by Mr. J        —

A    Yes, ma'am.

Q    — that you obtained.

## STATE'S EXHIBIT NO. 1 MARKED FOR

### IDENTIFICATION

The document herein referred to was thereupon marked for identification as above indicated.

**BY MS. WILLIAMSON:**

Q    I'm going to hand you what's been marked as State's Exhibit No. 1 and ask you to identify that for the jury.

A    This is the Miranda rights form that I completed with the Defendant.

88

Q      And that lead to the statement, which is State's Exhibit No. 2, where he says, "Have you" — where you asked him, "Have you ever reported that the children were neglected?" And his answer was, "Just that the mother was on the internet showing porn pictures of herself while her daughter was watching."

A      That's correct.

Q      Did he tell you any other thing?

A      No, ma'am.

Q      Did you give him an opportunity?

A      Yes, ma'am.

Q      Had he, would you have written it down?

A      Yes, ma'am.

MR. HOLROYD: I object to what he would have done, Judge. It's what he did do that's relevant.

THE COURT: Well, that's overruled. You can cross-examine him about it.

## STATE'S EXHIBIT NO. 3 MARKED FOR

## IDENTIFICATION

The document herein referred to was thereupon marked for identification as above indicated.

**BY MS. WILLIAMSON:**

89.

Q      I'm going to hand you what's been marked as State's Exhibit No. 3. Ask if you can identify that for the ladies and gentlemen of the jury?

A      Yes, ma'am. This is a photocopy of the cashier's check that I seized from the Defendant from First Community Bank for $15,500. And the rest is a photocopy of the money I seized from the Defendant.

Q      And that adds up to approximately $20,000?

A      Yes, ma'am.

Q      Which is what he said he offered in cash to Sylvia?

A      Yes, ma'am.

Q      What she refused to take for at least one or both of her children?

A      Yes, ma'am.

Q      Did the Defendant have with him any custody documents?

A      No, ma'am.

Q      Did he have anything for Sylvia to sign for her to sign her children over for this $20,000 in cash?

A      No, ma'am.

Q      Did the Defendant tell you he had been trying to negotiate custody of his grandchildren?

90

A    I don't recall if he said that.

Q    And did you give him an opportunity to write that down in this statement?

A    Yes, ma'am.

Q    Did you note that?

A    No, I didn't. I just done the questions that I actually was — what was written in the statement.

Q    Did the Defendant tell you about any prior document that he had Sylvia sign granting him custody or visitation?

A    No, ma'am.

Q    Did he tell you about any money that he had offered before to try to get custody of either A      or K      ?

A    No, ma'am.

Q    Are you a mandatory abuse and neglect reporter?

A    Yes, ma'am.

Q    As a result of your visit and discussion with Ms. J      , Sylvia, the mother of A      . and K      , did you report abuse or neglect with regard to those children?

A    No, ma'am.

Q    Did you go into the residence?

A    Yes, ma'am.

Q    Did you find it substandard?

91

A    No, ma'am.

Q    Did you find that they had been neglected in anyway?

A    No, ma'am.

Q    Did you give notice to that household that you were coming before you actually came?

A    Of course I did.

Q    How long before you came?

A    However long it took me drive from my office to that lady's house because the Defendant was there.

Q    Did you go with any lights and sirens? Or did you obey the speed limit? Or how quickly did you believe it was necessary to get there?

A    I don't know if I went lights and sirens but I got there as quickly as I could. I mean, that — as far as that, that was years ago, ma'am.

Q    How old was the Defendant when he tried to buy his granddaughter?

A    I'd have to look at his date of birth. Let me look at that statement, please. He was born in 1956.

Q    And this was 2006?

A    Yes, ma'am. 50 years old

92

MS. WILLIAMSON: State would move for admission of State's 1 through 3.

THE COURT: Any objection?

MR. HOLROYD: Subject to cross-examination.

THE COURT: All right. We'll hold off until then. Just hold off on that until you cross-examine.

MS. WILLIAMSON: Your witness.

THE COURT: All right. Go ahead, Mr. Holroyd.

## CROSS-EXAMINATION

**BY MR. HOLROYD:**

Q     When was that that you made your call out there to Kegley to arrest him?

A     I didn't hear your question, sir. I'm sorry.

Q     When was it that you went to Kegley to arrest the Defendant here?

A     Let me see that statement again. I received a call from his daughter-in-law. And that was on Tuesday, December 12th, the day I arrested him, of 2006.

Q     2006?

A     Yes, sir.

Q      Right? And you say that he was to pay $20,000 for the children, both children. Right?

A      That's correct.

Q      How much money did he have?

A      He didn't have $20,000 total on him at that time, but he had over 15,000, what I seized from him.

Q      He had a check for 15,000. Right?

A      15,500.

Q      15,500?

A      Yes, sir.

Q      And then what was the other money? How much was that?

A      $400 roughly.

Q      So it was something less that (sic) $16,000. Right?

A      Yes, sir.

Q      Did you inquire about where the rest of the $20,000 was?

A      I did.

Q      And what answer did he give?

A      He stated that he spent it on some other things. I don't recall exactly what he said, but he may have said something to the affect he gave it to some other family

94

Q      And that wouldn't tell you anything about the condition the children were in there in that house that she would be out there doing that, would it?

A      Sir, as far as the day I arrested your client, the — as far as the incident with his daughter-in-law and the video and the internet, it was far from — it wasn't even an issue that day. It wasn't even part of my investigation.

Q      You didn't care about that, did you?

A      Not at that moment in time, sir. No, sir.

Q      All right. Did you make any further investigation of this matter after you arrested him on this charge?

A      No, sir.

Q      Did you talk to any other family members to see if there was any corroboration of his position that the children were not being properly cared for?

A      No, sir.

Q      You just took the idea that he was buying the children and his reasons for doing it were of no concern to you. Right?

A      He committed a crime of trying to buy children in the State of West Virginia. That's what my investigation was for, sir. I mean, no other reason. There's no other issues attached.

(12)     The Court **FINDS** that at the omnibus habeas corpus

hearing the Petitioner testified about the question of severance:

Q       Now, you were tried on two separate instances.

One was the attempt to -- alleged attempt to purchase your

children, A⁻      and K      . and the other was with regard to

alleged sexual contact with A       P      . Is that right?

A       That's correct.

Q       Was there ever any discussion of — of

attempting to try those cases separately with you and Mr.

Holroyd?

A       That I don't know.  I didn't understand legal

work so I thought it was the norm to try them together.

Q       Did you ever have a discussion with

Mr. Holroyd about that issues?

A       I don't think so.  Like I say, I thought that

was the norm.

(*See* Omnibus Habeas Corpus Transcript of December 12,

2014, at p. 26, L:1 – 15)

(13)     The Court **FINDS** that the West Virginia Supreme Court of Appeals

implicitly indicated that a severance of the charges contained in Count 1 and 2

of the indictment from those contained in Count 3 through 10 was not required,

in that it found the evidence of the Petitioner's inappropriate touching of

C_ R_ to have been properly admitted under Rule 404(b) of the West Virginia Rules of Evidence. (*See* Memorandum decision)

(14) The Court **FINDS** that the very heart of the State's case was that the Petitioner attempted to purchase his grandchildren from their mother in an effort to have additional opportunities to have sexual contact with small children, which was the gravamen of the charges contained in Counts 3 through 10 of the indictment.

(15) The Court **FINDS** that these cases fit exactly within the law of this state that defendants are not entitled to relief from prejudicial joinder when evidence of each of the crimes charged would be admissible in separate trials for the other.

(16) The Court **FINDS** that there was no irregularity in the *voir dire* process that could have contributed to a jury reaching a different result, particularly in light of the direct evidence of the commission of all of these crimes by the Petitioner as presented by the witnesses who testified at the trial and which testimony is set out, *supra.*

(17) The Court **FINDS** that the affidavit of Misty Ellis filed on September 17, 2015, is an attempt to show a "pertinent trait" that the Petitioner is not a danger to children.

(18) The Court **FINDS** that the admissibility of this evidence is governed by Rule 404(a)(2)(A) of the West Virginia of Evidence, which states that "a defendant may offer evidence of the defendants pertinent trait."

98

(19)    The Court **FINDS** that the West Virginia Supreme Court of Appeals addressed the use of similar evidence in *State v. Marrs*, 180 W. Va. 693, 379 S.E.2d 497 (W. Va.) 1989, in which a defendant charged with a drug offense was not allowed to introduce evidence of his reputation for not selling drugs:

> In a prosecution for the sale of illegal drugs, *W.Va.R.Evid.* 404 does not allow the defendant to introduce evidence of his reputation for not selling illegal drugs, syl. pt. 5.

(20)    The Court **FINDS** that the evidence proffered by the Petitioner would not have been admissible during the trial, because it is not evidence of a pertinent trait.

(21)    The Court **FINDS** that none of the other issues raised by the Petition as to the effectiveness of his trial counsel rise to the level required to demonstrate that there is a reasonable probability that a different result would have been rendered.

(22)    The Court **FINDS** that the Petitioner was convicted at the second trial after the first trial ended in a hung jury, thus allowing Petitioner's counsel to have a complete idea of the State's evidence.

(23)    The Court **FINDS** that Petitioner's trial counsel more than adequately represented the Petitioner's interest throughout this proceeding and in the preparation and conduct of his defense.

(24)    The Court **FINDS** and concludes that the Petitioner has failed to prove by a preponderance of the evidence that his trial counsel was ineffective in any area of the representation of the Petitioner.

99

(25)    The Court **FINDS** and concludes that the Petitioner's claim that he received ineffective assistance of counsel is without merit.

## 2.    DID THE PETITIONER RECEIVE A DISPROPORTIONATE SENTENCE?

### a.    The Petitioner's Argument:

**PETITIONER'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS WERE VIOLATED BY HIS DISPROPORTIONATE SENTENCE.**

According to the West Virginia Supreme Court of Appeals, "[b]oth the United States Constitution and the West Virginia Constitution prohibit sentences which are disproportionate to the crimes committed." E.g., *State v. Richardson*, 214 W.Va. 410, 413, 589 S.E.2d 552, 555 (2003). The Supreme Court of Appeals has established a two stage analysis for determining if a sentence is disproportionate.

First, the subjective test is analyzed. According to the Cooper court, "[p]unishment may be constitutionally impermissible...if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity..." *State v. Cooper*, 172 W.Va. 266, 304 S.E.2d 851 (1983) at Syll. Pt. 5.

If the sentence does not shock the conscience of the court, then the second objective test is evaluated. In that test, numerous factors are examined to determine if the sentence is disproportionate. Factors to be considered include the age of the defendant, prior record of the defendant, rehabilitative potential (including post arrest conduct, age and maturity), statements of the victim, evaluations made in anticipation of sentencing, and remorse of the defendant. Id. at 271-272, 856; see also *State v. Booth*, 224 W.Va. 307, 314, 685 S.E.2d 701, 708 (2009). Additional guidelines for

the objective test were set out in Syllabus point 5 of *Wanstreet v. Bordenkircher*, 166 W. Va. 523, 276 S.E.2d 205 (1981), as follows:

In determining whether a given sentence violates the proportionality principle found in Article III, Section 5 of the West Virginia Constitution, consideration is given to the nature of the offense, the legislative purpose behind the punishment, a comparison of the punishment with what would be inflicted in other jurisdictions, and a comparison with other offenses within the same jurisdiction.

Sentences within legal guidelines can transgress the proportionality principles. E.g. *State v. David*, 214 W.Va. 167, 177, 588 S.E.2d 156, 166 (2003), *State v. Richardson*, 214 W.Va. 410, 413, 589 S.E.2d 552, 555 (2003), c.f. *State v. Slater*, 222 W.Va. 499, 665 S.E.2d 674 (2008). Disproportionate sentence issues are appropriate for a habeas corpus petition. E.g., *State ex rel. Hatcher v. McBride*, 221 W.Va. 760, 656 S.E.2d 789 (2007).

Here, Petitioner's effective sentence of fifteen to forty-five years (15-45) violates the constitutional proportionality requirements. Petitioner had no prior criminal record. (Ex. 8 at 17-18). He had a difficult upbringing, but overcame it and was a hard worker. (Ex. 8 at 19-20, 22-23). He is a veteran with an honorable discharge. (Ex. 8 at 24). He received support from the community at the time of sentencing. (Ex. 8 attachments). Further, the punishment is far in excess of punishment for similar crimes in surrounding jurisdictions. Based on all of this, the sentence is not objectively reasonable.

### b. The State's Response:

The Petitioner further contends that his Constitutional Rights were violated by his disproportionate sentence. However, the State disagrees. The sentence was

101

appropriate given the severity of the charges and were well within the sentences set forth by statutes for the various crimes. The sentence in this case does not in shock the conscious. Therefore, the State contends that the Petitioner is not entitled to relief.

c. **Finding of Fact and Conclusions of Law:**

(1) The Court **FINDS** that the trial court's sentence was within statutory limits and was not based on impermissible factors. *State v. Goodnight*, 169 W. Va. 366, 287 S.E.2d 504 (W. Va. 1981) at syl. Pt. 4, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995).

(2) The Court **FINDS** that sentences which are within the statutory limits are not entitled to statutory review. *State v. Koon*, 190 W. Va. 632, 440 S.E.2d 442 (1993).

(3) The Court **FINDS** that, while constitutional proportionality standards theoretically can apply to any criminal sentence, they are basically applicable to those sentences where there is either no fixed maximum set by or where there is a life recidivist statute. *Wanstreet v. Bordenkircher*, 166 W. Va. 523, 276 S.E.2d 205 (1981). at syl. Pt. 4. The sentences in this action are not of either type.

(4) The Court **FINDS** that the Petitioner faced exposure to a minimum sentence of seventy (70) years to a maximum sentence of two hundred and five (205) years upon his conviction of all of the charges in this indictment, but was actually sentenced to an effective term of fifteen (15) years to forty-five (45) years in the penitentiary.

(5) The Court **FINDS** and concludes that the Petitioner did not receive a severer sentence than expected.

(6) The Court **FINDS** and concludes that the Petitioner did not receive an excessive sentence.

102

(7) The Court **FINDS** and concludes that the Petitioner has failed to prove by a preponderance of the evidence that he received a disproportionate sentence.

(8) The Court **FINDS** and concludes that the Petitioner's claim that he received a disproportionate sentence is without merit.

## 3. WERE THE PETITIONER'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS VIOLATED BY THE CUMULATIVE EFFECT OF THE ERRORS CITED HEREIN?

### a. The Petitioner's Argument:

Pursuant to the cumulative error doctrine, "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) *cited with approval in United States v. Martinez*, 277 F.3d 517, 532 (4th Cir. 2002). Thus, the West Virginia Supreme Court has held that "[w]here the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error." *Syllabus Point 5, State v. Smith*, 156 W.Va. 385, 193 S.E.2d 550 (1972).

In the case at bar, the significant number of errors warrant a finding that Petitioner's underlying proceeding was unfair.

### b. State's Response:

The State did not respond to this assertion.

103

### c. Findings of Fact and Conclusions of Law:

(1)  The Court **FINDS** that the West Virginia Supreme Court of Appeals has held that:

> Where the record of a criminal trial shows that the **cumulative** effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing along would be harmless error. *State v. Smith*, 156 W.Va. 385, 193, S.E.2d550 (W.Va. 1972) syl. pt. 5. *See* also, *State v. Schermerhorn*, 211 W.Va. 376, 566 S.E.2d 293 (2002); and *State v. Cook*, 228 W.Va. 563, 723 S.E.2d 388, 2010 W.L. 4275253 (W.Va.).

(2)  The Court **FINDS** and concludes that because none of the allegations of error asserted above constitute grounds to grant the Petition, the claim of cumulative error which unfairly prejudiced the Petitioner is without merit.

## 4. WHETHER THE OTHER GROUNDS RAISED BY THE PETITIONER IN HIS *LOSH* CHECKLIST AND THE PRIOR PLEADINGS ENTITLE HIM TO RELIEF[6]

### a. Petitioner's Argument:

Petitioner also hereby asserts all grounds raised in his *Losh* checklist filed contemporaneously herewith. Petitioner also asserts and incorporates by reference as if set out verbatim herein in his "Petitioner under W. Va. Code §53-4A-1 for Writ of Habeas Corpus" presiding herein.

---

[6] The Court has specifically addressed the grounds of whether the trial counsel lacked jurisdiction, whether there was prejudicial pretrial publicity, whether the indictment was defective, whether the Petitioner was denied a full public hearing, whether there were Constitutional errors in the trial court's evidentiary rulings, whether the prosecution made prejudicial statements, and whether there was sufficient evidence to sustain the Petitioner's conviction, in this section.

104

**b. State's Response:**

The State did not respond to this assertion.

**c. Findings of Fact and Conclusions of Law:**

(1) The Court **FINDS** that the Petitioner has raised the ground that the trial court lacked jurisdiction, because some of the events in questions were alleged to have occurred in Tennessee.

(2) The Court **FINDS** that it has previously discussed the concept of intrinsic versus extrinsic evidence, in Section III.C.1.c.(6), *supra.*

(3) The Court **FINDS** that as to lack of jurisdiction, the Petitioner testified that:

Q      The first issue is that the trial court lacked jurisdiction because some of the incidents allegedly occurred in Tennessee. Is that relating to some of the children's — some of the child's testimony that some of the acts took place in the home in Tennessee?

A      According to her or to me?

Q      According to her. ·

A      I don't think she alleged anything took place down there.

Q      Was that an issue that I advised you to assert?

A      Yeah.

Q      All right. And would — and would you stand

105

by any arguments we made with regard — in the brief regarding to that issue? In the documents that we filed with the Court?

Do you assert the documents about the issues that I raised in the — in your memorandum regarding that issue?

A    I'm not sure I understand.

Q    Sure. Let me take a — let me take a step back.

There are some issues with regard that we raised together were issues that I discovered in my investigation.

A    Oh, yes.

Q    Is that right?

A    Yes.

(*See* Omnibus Habeas Corpus Transcript of December 12, 2014, at p. 28, L:16 thru p. 29, L:21)

(4) The Court **FINDS** that these acts, if they occurred, were "inextricably intertwined" with the alleged offenses in Mercer County, much like occurred in the case of *State v. Cyrus,*222 W.Va. 214, 664 S.E.2d.99 (W.Va. 2008).

(5) The Court **FINDS** that the Petitioner has failed to prove by a preponderance of the evidence that the trial court lacked jurisdiction.

(6) The Court **FINDS** and concludes that the Petitioner's claim that the trial court lacked jurisdiction is without merit.

106

(7) The Court **FINDS** that the Petitioner alleges that he experienced prejudicial pretrial publicity.

(8) The Court **FINDS** that the West Virginia Supreme Court of Appeals has addressed the issue of prejudicial pretrial publicity in the context of the issue of whether or not venue should be changed in criminal cases:

1. " 'To warrant a change of venue in a criminal case, there must be a showing of good cause therefore, the burden of which rests on the defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused.' Point 2, Syllabus, *State v. Woolridge*, 129 W.Va. 448, 40 S.E.2d 899 (1946)." Syllabus Point 1, *State v. Sette*, 161 W.Va. 384, 242 S.E.2d 464 (1978);

and:

2. " 'A present hostile sentiment against an accused, extending throughout the entire county in which he is brought to trial, is good cause for removing the case to another county.' Point 2, Syllabus, *State v. Dandy*, 151 W.Va. 547, 153 S.E.2d 507 (1967), *quoting* Point 1, Syllabus, *State v. Siers*, 103 W.Va. 30, 136 S.E. 503 (1927)." Syllabus Point 2, *State v. Sette*, 161 W.Va. 384, 242 S.E.2d 464 (1978);

and:

3. One of the inquiries on a motion for a change of venue should not be whether the community remembered or heard the facts of the case, but whether the jurors had such fixed opinions that

107

they could not judge impartially the guilt or
innocence of the defendant.

*State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731
(W. Va. 1994). Syllabus Points 1, 2, and 3.

(9) The Court **FINDS** that the Petitioner offered the following testimony
regarding his claim of prejudicial pretrial publicity:

Q    With regard to prejudicial pre-trial publicity,
was that with regard to the newspaper articles that were in -
- in the paper regarding your case?

A    Yes.

(*See* Omnibus Habeas Corpus Transcript of December 12,
2014, at p. 30, L:4 – 8)

(10)   The Court **FINDS** that, in addition, the Petitioner attached a
short article from the Bluefield Daily Telegraph, dated December
14, 2006, which states that he was arrested for two (2) counts of
attempting to buy his grandchildren. (*See* Exhibit 7 to the
Amended Petition for Writ of Habeas Corpus, attached thereto).

(11)   The Court **FINDS** that this article was published in the
paper almost five (5) years before the trial, and further, that it made
no mention of the sexual offenses which constituted the bulk of the
indictment.

(12)   The Court **FINDS** that the Petitioner has failed to prove by
a preponderance of the evidence that there was a present hostile
sentiment against him in Mercer County at the time of the trial, or

108

that any juror who was allowed to serve had such a fixed opinion that they could not judge impartiality the guilt or innocence of the Petitioner.

(13)    The Court **FINDS** and concludes that his claim that he experienced unfair pretrial publicity is without merit.

(14)    The Court **FINDS** that the Petitioner next argues that the indictment against him was defective.

(15)    The Court **FINDS** that in Syllabus Point 4 of *State v. Chaffin*, 156 W. Va. 264, 192 S.E.2d 728 (1972), the West Virginia Supreme Court of Appeals held that "[a] variance in the pleading and the proof with regard to the time of the commission of a crime does not constitute prejudicial error where time is not of the essence of the crime charged."

(16)    The Court **FINDS** that *W. Va. Code §62-2-10*, specifically states, in pertinent part:

> No indictment of other accusation shall be quashed or deemed invalid...for omitting to state, or stating imperfectly, the time at which the offense was committed...

(17)    The Court **FINDS** that in *State ex rel. State v. Reed*, 204 W. Va. 520, 514 S.E.2d 171, (1999) the West Virginia Supreme Court of Appeals stated (while quoting *State v. Hensley*, 120 N.C. App. 313, 462 S.E.2d 500, 557 (1995)) that "[y]oung children cannot be expected to be exact regarding times and dates [;] a child's uncertainty as to the time and date upon which the

109

offense charged was committed goes to the weight rather than to the admissibility of the evidence. Nonsuit may not be allowed on the ground that the State's evidence fails to fix any definite time for the offense where there is sufficient evidence that defendant committed each essential act of the offense."

(18) The Court **FINDS** that additionally, *Reed* quoted *State v. Long*, 320 Or. 361 885 P.2d 696, 700 (1994) stating "[t]he state was not required to prove that the offense was committed on the date alleged in the indictment."

(19) The Court **FINDS** that "[a] conviction under an indictment charged, through the proof was at variance regarding immaterial dates, precludes a subsequent indictment on the exact same material facts contained in the original indictment." *See generally State v. Sears*, 196 W. Va. 71, 468 S.E.2d 324 (1996).

(20) The Court **FINDS** that the West Virginia Supreme Court of Appeals has held that:

> " 'An indictment for a statutory offense is sufficient if, in charging the offense, it substantially follows the language of the statute, fully informs the accused of the particular offense with which he is charged and enables the court to determine the statute on which the charge is based.' Syl. Pt. 3, *State v. Hall*, 172 W.Va. 138, 304 S.E.2d 43 (1983)." Syl. Pt. 1, *State v. Mullins*, 181 W.Va. 415, 383 S.E.2d 47 (1989). Sy. Pt. 3, *Ballard v. Dilworth*, 230 W.Va. 449, 739 S.E. 2d 643.

(21) The Court **FINDS** that the West Virginia Supreme Court of Appeals has held that:

110

" 'An indictment is sufficient under *Article III, §14 of the West Virginia Constitution* and *W. Va. R. Crim. P.* 7(c) (1) if it (1) states the elements of the offense charged; (2) puts a defendant on fair notice of the charge against which he or she must defend; and (3) enables a defendant to assert an acquittal or conviction in order to prevent being placed twice in jeopardy.' Syl. Pt. 6, *State v. Wallace,* 205 W.Va. 155, 517 S.E.2d 20 (1999)." Syl. Pt. 5, *State v. Haines,* 221 W.Va. 235, 654 S.E.2d 359 (2007). Syl. Pt. 4, *Ballard v. Dilworth,* 230 W.Va. 449, 739 S.E.2d 643.

(22) The Court **FINDS** that this allegation fits within the assertion that there was a defect in the indictment, namely, a failure to state the exact date and time of the commission of the crime.

(23) The Court **FINDS** that the dates and several of the counts charged in the Petitioner's indictment were based upon the accounts of the child victims.

(24) The Court **FINDS** that Sergeant Melissa Clemons of the West Virginia State Police testified as to her methodology in determining how to charge the Petitioner:

**SERGEANT MELISSA CLEMONS** was thereupon called as a witness by the State and, having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MS. WILLIAMSON:**

Q     State your name.

A     Melissa Clemons

Q     Where are you employed?

A     I'm a sergeant with the West Virginia State Police.

Q     Do you have any special assignment with the State Police?

111

A	Yes, ma'am. I'm currently assigned to the Crimes Against Children Unit.

Q	What's that?

A	It's a special unit that we just focus primarily on internet crimes against children, sexual abuse against children, physical abuse and neglect.

Q	As an investigator for the Crimes Against Children, did you have an occasion to investigate abuse and assault against A   P   ?

A	That was actually prior to me being assigned to that unit. I was the Assistant Detachment Commander at the Princeton Detachment but I did all the sexual abuse exams — or investigations, but yes, ma'am, I did.

Q	Okay. And how did that come about?

A	It was referred to me through Child Protective Services. They sent me a law enforcement referral for an investigation.

A referral had been made to Child Protect Services that Mr. J     , the step-grandfather of A   P   and C   R   , had been touching them inappropriately and it had been — basically what they call it at CPS is screened out, that CPS wasn't going to take any action at this time because he was an out-of-home perpetrator and the parents were taking action to protect them. So it was just referred for law enforcement investigation.

Q	So what did you do as far as law enforcement investigation?

A	I contacted our local child advocacy center here in Mercer County, Child Protect, and forensic interviews were scheduled for both girls, A    and C    , and I contacted April, their mother, and advised her when the interviews

112

would be conducted. And I went to — what will happen is, we have a forensic interviewer that actually interviews the children. It's video and audio taped in a separate room. And we sit in the other room and observe it on the video camera.

Q    And did C        and A      . both participate in that?

A    Yes, ma'am. And I went and observed the interviews.

Q    How old was A        at the time?

A    Her birthday's      . She was — it was        . She had just — she was a little over eleven.

Q    How old was the Defendant?

A    I'd have to look at his birthday. I don't know.

MS. WILLIAMSON: May I approach, Your Honor?

THE COURT: Sure.

THE WITNESS: I have his birthday as                 So February, 2008, he would have been — I'm sorry. He would have been 51.

**BY MS. WILLIAMSON:**

Q    In the course of your investigation, how do you determine what date to use to allege that these actions occurred?

A    I used the forensic interviews of the children. Like I said, I observed those and I had them transcribed.

Q    When were those forensic interviews conducted?

A    They were conducted on February 14th, 2008. I had received the — the initial complaint had come into CPS on February 8th, 2008.

113

So based on their interviews, statements made by the girls during their interviews and — I don't know if I can say what they said, because that's how I determined it. But it was based on their statements and also when I spoke with April and Kirby (verbatim) J    ', in their statements, they advised that they were married February 24th, 2007 and it was after their wedding that Mr. J, began to visit them.

Q    You said April and Kirby. Did you mean Kevin?

A    I'm sorry. Yes, ma'am.

Q    Okay. That's the gentleman that was here earlier. Right?

A    Yes. I'm sorry. I apologize. I took a statement from them together and they advised that their wedding date was February 24th, 2007, and it was after that date that Mark J    · began to visit them on the weekends. I don't know if it was throughout the week. But he would come up by hisself and then allegedly the abuse ended prior to their one year anniversary, which would haven February 24th, 2008.

Q    How did you determine how many times and what counts to charge?

A    That was based on their forensic interviews, again. Statements made in the forensic interview. And also based on Ms. Hasty's counseling records.

Q    How is it that they came to go to Ms. Hasty?

114

A     If I remember, once they go to Child Protect for their interviews, at the end of that interview — we also have a family advocate. I don't know if she was employed there at that time. But counseling services are offered.

Now we do have counseling services at Child Protect, but if it — and it's offered to everybody that comes through there. And names of local counselors are given to the family. They're allowed to chose who they go to.

I do remember when I was speaking to April and her husband at the office, they mentioned that the girls were having some trouble and I recommended that they go to counseling.

Q     Did you recommend a specific counselor?

A     No, ma'am. And I'm familiar with, you know, the counselors in the area because I do these investigations. So I will give them the names. I don't have their numbers though.

Q     Did A    P   '— was she able to provide you specific dates and times that the Defendant abused her?

A     No, ma'am. Like I said, I went — C.    was more — in her statement was more - - because it was focused around the anniversary because they had went out to eat for the anniversary and then the anniversary trip was coming up and he was supposed to babysit. And then I went, you know, based on when they said he started coming around regularly.

Q     And when was that?

115

A    After their marriage. After they got married on February 24th, 2007.

Q    And it stopped when they disclosed?

A    As soon as they disclosed, the parents took the appropriate action. I don't know if they went and got a domestic violence petition or not.

Q    What's your training and experience as far as collecting forensic interviewing — or evidence. Can you first explain what forensic evidence would be.

A    Forensic evidence would be fingerprints, DNA, which would be blood, semen, saliva, things of that nature. Of course, we're trained for that at our initial training at the State Police Academy. It's a thirty-two week course at the State Police Academy in Institute. And we have training throughout our career that we have to go through.

Q    In this case, what forensic evidence did you collect?

A    None.

Q    Why not?

A    You're not going to have — of course, based on the statements by the girls, it was digital penetration and touching. There was no indication that Mr. J    had ejaculated either on them, in them, around. So you're not going to have any semen to collect. He's not going to leave fingerprint marks. You can't fingerprint, you know, their bodies.

Q    You mean you can't fingerprint body parts like you can on TV?

A    I never have. You can — I don't think that would be possible.

116

Of course, there was no clothing to collect, again. There would be no semen on anything. It was digital penetration. No blood. Perhaps you could have gotten some saliva because the girls disclosed him trying to stick his tongue in their mouth. But where it had been so long, even if we have a rape victim where they do disclose ejaculation, penetration, that nature, after seventy-two hours, there's no possible way to collect DNA.

Q    And this was how long after?

A    The best I could determine, the last incident had occurred the last time Mr. J        was visiting which was prior to my meeting with them, so it would have been a couple of weeks.

MS. WILLIAMSON: Thank you.

Your witness.

THE COURT: All right. Mr. Holroyd.

## CROSS-EXAMINATION

**BY MR. HOLROYD:**

Q    Sergeant, how did Phyllis Hasty get involved in this thing?

A    I really don't know. Like I said, counselor's name are given out at Child Protect. I did recommend they seek a counselor to help the girls. How they picked Ms. Hasty, I don't know.

Q    Do you know whether or not — now, she's a play therapist. Right?

A    Yes, sir.

Q    Do you know whether or not these children ever went to a psychiatrist or a psychologist?

117

A      Not to my knowledge. No, sir.

Q      There are plenty of psychiatrist and psychologist available to make the examination of these matters, aren't there?

A      The only psychiatrist — I don't even know if he's a psychiatrist, is Steve Ferris.

Q      Well, we have several of them in this county, don't we?

A      They don't normally work with our sexual abuse victims, to be honest. So —

Q      Is there any reason why you couldn't find one that would work with them?

MS. WILLIAMSON: Objection as to relevancy, Your Honor.

THE COURT: Overruled.

THE WITNESS: I don't — like I said, we have a list of counselors that normally treat sexual abuse victims. Sometimes — and again, I don't even know if Steve Ferris — if he's an actual psychiatrist. I know there's Dr. Brezinski, but he normally works with ADHD and to my knowledge, sexual abuse is a —

BY MR. HOLROYD:

Q      There's several others in the State that work with children who are psychiatrists and psychologists, are there not?

A      I suppose.

Q      But in this case you end up with the play therapist. Is that right?

A      I don't know how they ended up with her, but yes, they did.

MR. HOLROYD: That's all, Judge.

118

THE COURT: Any other questions at all?

MS. WILLIAMSON: No, sir.

THE COURT: Can she step down?

MS. WILLIAMSON: Yes, sir.

THE COURT: Thank you. You can step down.

(*See* Trial Transcript of November 1, 2011, at p. 219, L:15 thru p. 230, L:10)

(25) The Court **FINDS** that the indictment in this action substantially followed the language of the statute, fully informed the Petitioner of the accused of the particular offenses with which he was charged, and enabled him to assert an acquittal or conviction in order to prevent being placed twice in jeopardy.

(26) The Court **FINDS** that the Petitioner has failed to prove by a preponderance of the evidence that there were defects in the indictment.

(27) The Court **FINDS** and concludes that the Petitioner's assertion that his federal and state constitutional rights were violated by defects in the indictment is without merit.

(28) The Court **FINDS** that the Petitioner also alleged that he did not have a full public hearing.

(29) The Court **FINDS** that the Petitioner testified about his claim that he did not have a full public hearing:

Q     With regard to the lack of full public hearing, you advised me that the courtroom may have been cleared. Can you tell the Court -- the judge about that.

A     There was a couple of times when Your Honor thought that -- had people leave so that the attorneys could talk or something.

Q     Did you ask me to assert that issue on your behalf for that reason?

A     Yes.

THE COURT: I don't understand what he -- what you all are talking about, so why don't you clear that up for me.

BY MR. CASSELL:

Q     Was that one —

MR. CASSELL: Your Honor, I was instructed to assert that issue on his behalf.

THE COURT: Well, what is he saying?

BY MR. CASSELL:

Q     Was that with regard to times when witnesses were asked to step out if they were going to testify in the case?

A     Yes.

Q     And was that at times when the jury was

required to leave so that arguments could be held before the trial court, before the judge outside the presences of the jury?

A    Yes.

THE COURT: So he didn't want me to sequester the witnesses or excuse the jury when we argued legal matters? That's the grounds?

MR. CASSELL: Yes, sir.

THE COURT: Okay. All right.

(*See* Omnibus Habeas Corpus Transcript of December 12, 2014, at p. 30, L:17 thru p. 32, L:3)

(30)    The Court **FINDS** that there is no assertion that the Petitioner was not present during any stage of the proceeding, but he instead argues that the witnesses should not have been sequestered during testimony and the jury should have been present while the parties argued questions of law before the Court.

(31)    The Court **FINDS** that witness sequestration during testimony and excusal of the trier of fact while legal questions are argued are each fundamental to the adversarial system of justice utilized in West Virginia jurisprudence.

(32)    The Court **FINDS** that the Petitioner has failed to prove by a preponderance of the evidence that he was denied a full public hearing.

(33)    The Court **FINDS** and concludes that the Petitioner's assertion that he did not have a full public hearing is without merit.

121

(34)   The Court **FINDS** that the Petitioner asserted that the trial court made constitutional errors in evidentiary rulings.

(35)  The Court **FINDS** that with regard to constitutional errors in evidentiary rulings the Petitioner testified that:

> Q      With regard to the constitutional errors and evidentiary rulings was that with regard to the issues that I've raised in the brief?
>
> A      Yes.
>
> (*See* Omnibus Habeas Corpus Transcript of December 12, 2014, at p. 32, L:5 – 8)

(36)  The Court **FINDS** that the Petitioner has not presented any evidentiary ruling which would have constituted an error of constitutional proportions.

(37)  The Court **FINDS** that the Petitioner has failed to prove by a preponderance of the evidence that there were such errors.

(38)  The Court **FINDS** and concludes that the Petitioner's argument that there were constitutional errors in the trial court's evidentiary rulings is without merit.

(39)  The Court **FINDS** that although the Petitioner raised the issue that the prosecuting attorney made a prejudicial statement in her closing argument, it was specifically precluded by the West Virginia Supreme Court of Appeals in its Memorandum decision at footnote 4:

> This Court finds no merit in petitioner's contention that the prosecuting attorney's statement in closing argument, admonishing the jury to now allow petitioner to "buy his way out of this verdict," was prejudicial. Petitioner failed to show that the prosecuting attorney's limited, isolated remark was so damaging as to require reversal. *See* Syl. Pt. 6,

122

*State v. Sugg*, 193 W.Va. 388, 456 S.E.2d 469 (1995).

(40) The Court **FINDS** that the Petitioner has asserted the ground that there was not sufficient evidence to sustain a conviction.

(41) The Court **FINDS** that with regard to the sufficiency of the evidence, the Petitioner stated that:

> Q    With regard to the sufficiency of the
>
> evidence, is that issues related to the fact you didn't
>
> do this crime and you do not believe there was sufficient
>
> evidenced to convict you?
>
> A    Yes.
>
> (*See* Omnibus Habeas Corpus Transcript of
>
> December 12, 2014, at p. 32, L:13 – 17)

(42)    The Court **FINDS** that it is the function of the jury to weigh the testimony at trial and to make credibility determinations. *State v. Burton*, 163 W. Va. 40, 254 S.E.2d 129 (1979).

(43)    The Court **FINDS** that in determining whether or not there was sufficient evidence to sustain a criminal conviction, the West Virginia Supreme Court of Appeals has stated that:

> (w)hen a criminal defendant undertakes a sufficiency challenge, all of the evidence, direct and circumstantial, must be viewed from the prosecutor's coign of vantage, and the viewer must accept all reasonable inferences from it that are consistent with the verdict. This rule required the trial court judge to resolve all evidentiary conflicts and credibility questions in the prosecutor's favor;

123

moreover, as among competing inferences of which two or more are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt. *State v. LaRock*, 196 W. Va. 294, 470 S.E.2d 613 (W.Va. 1996), syl. pt. 2.

(44) The Court **FINDS** that the West Virginia Supreme Court of Appeals has also held that:

(t)he function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the Defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Guthrie*, Syl. Pt. 1, 194 W.Va. 756, 461 S.E.2d 163 (1995).

(45) The Court **FINDS** that the *Guthrie* court also stated that:

(a) criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not for an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find a guilt beyond a reasonable doubt. To the extent that our

124

> prior cases are inconsistent, they are expressly overruled." Syl. Pt. 3, *Guthrie, infra.*

(46) The Court **FINDS** that considering the evidence in the light most favorable to the prosecution, there was more than sufficient evidence to sustain the Petitioner's convictions on all counts, specifically;

    a. the testimony of Corporal James Long and Sylvia A    .J.   on Counts 1 and 2;

    b. the testimony of C   R   and A   P   on Count 3 through 10.

    c. The testimony presented by the other witnesses for the State.

(47) The Court **FINDS** that the jury, as the trier of fact, determined the credibility of the witnesses and resolved any conflicts in favor of the State.

(48) The Court **FINDS** that the Petitioner has failed to prove by a preponderance of the evidence that there was not sufficient evidence upon which to convict him.

(49) The Court **FINDS** and concludes that the Petitioner's allegations that there was not sufficient evidence to convict him is without merit.

(50) The Court **FINDS** and concludes that there were no other grounds raised by the Petitioner in his *Losh* checklist or in the prior pleadings which constitute grounds for relief, and that the assertion is without merit.

125

## D. RULING

Wherefore, for the reasons set forth in the foregoing opinion order, the Court hereby orders and adjudges as follows:

1.  The Petitions for Writ of Habeas Corpus *ad Subjiciendum* are hereby denied and this action is removed from the docket of this Court.

2.  The Court appoints Paul R. Cassell, Esq., to represent the Petitioner should he choose to appeal this ruling.

3.  This is the final order. The Circuit Clerk is directed to distribute a certified copy of this Order to Paul R. Cassell, Esq., at his address of 340 West Monroe Street, Wytheville, Virginia, 24382; to Scott A. Ash, Esq., Prosecuting Attorney of Mercer County, West Virginia, at his address of 120 Scott Street, Suite 200, Princeton, West Virginia, 24740; and to the Petitioner, Mark J       , c/o Mt. Olive Correctional Complex, #1 Mountain Side Way, Mt. Olive, West Virginia, 25185.

Entered this the 22nd day of September, 2015.

_____
DEREK C. SWOPE, JUDGE

THE FOREGOING IS A TRUE COPY OF A DOCUMENT
ENTERED IN THIS OFFICE ON THE 22 DAY
OF September 20 15
DATED THIS 22 DAY OF September
20 15

JULIE BALL, CLERK OF THE
CIRCUIT COURT OF MERCER COUNTY WV
BY Carla Ball
HER DEPUTY

126